Clyde TOOLE, Administrator of the Estate of Willie Mae Toole, Deceased

v.

UNITED STATES of America.

Civ. A. No. 75–2311.

United States District Court,
E. D. Pennsylvania.

Dec. 30, 1977.

Louis Samuel Fine, Philadelphia, Pa., for plaintiff.

Alfred A. Gollatz, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

Plaintiff's decedent was fatally injured in an explosion at her place of employment, the Large Street plant of Action Manufacturing Company (Action), in Philadelphia. The incident occurred while she was working on a partially assembled "fuze rocket," an antitank explosive that Action produced for the United States Army. Shortly thereafter, her husband filed this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1970), asserting causes of action under both the Pennsylvania survival statute, 20 Pa.Cons.Stat.Ann. § 3371 (Purdon 1975), and the Pennsylvania wrongful death statute, Pa.Stat.Ann. tit. 12, §§ 1601–04 (Purdon 1953). Jurisdiction is based on 28 U.S.C. § 1346(b) (1970). After considering the pleadings and the evidence offered at trial, I make the following findings of fact. Fed.R.Civ.P. 52(a).

1. The United States Army Munitions Command awarded Action a contract (Plaintiff's Exhibit 2) for the manufacture of M412A1 "fuze rockets." This contract took effect on March 2, 1973, and it called for the delivery of 668,200 fuze rockets between August 31, 1973 and August 31, 1974.

2. The contract was administered by the Defense Contract Administration Services Region, Philadelphia (DCASR), an office of the Defense Supply Agency.

3. On January 26, 1973, Leo A. Everett, a Safety Engineer in the Specialized Safety and Flight Operations Division of DCASR's Directorate of Quality Assurance, made a pre-award safety survey of Action's Large Street plant. In a survey of this kind, DCASR personnel review the prospective contractor's facilities and assess its potential for compliance with the contractual safety requirements. Everett's report on his visit (Plaintiff's Exhibit 7) stated that Action was already producing the M412A1 fuze pursuant to another government contract, and that the award of the proposed contract would not "cause violations of the contractual safety requirements."

4. Throughout the time that the contract was in force, Walter Wotjas, a Quality Assurance Representative (QAR), and two or three other quality control specialists assigned to him were "in residence" at Action's Large Street plant and shared an office at the plant. None of the men had extensive training or experience in the field of explosives safety.

5. In the course of performing their quality assurance functions, Wotjas or one of the men assigned to him inspected the "loading plant" area at Action once or twice a day. These inspections were aimed at detecting potential quality assurance problems, and included noting any obvious safety hazards that might impair Action's ability to meet the production schedule set out in the contract. If such a problem or hazard was observed, the inspector would notify the supervisor of the Action employee whose work area was involved. If no corrective measures were taken, the inspector would then notify Everett. Neither Everett nor the inspectors, however, could compel Action to alter its procedures.

6. At one stage in the process of assembling a fuze, a small M106 primer is "staked" into an M48 detonator. During the period covered by the contract, this task was performed by a single Action employee sitting at a work table in the "loading plant" area of the Large Street plant. Both the primer and the detonator contain

explosive material, and both are ranked as Class 7 hazards (Mass Detonating Hazards). Plaintiff's Exhibit 1, ¶ 709, at 7–7 to –8.

7. The operator of the staking device works behind a plexiglass shield at a plywood table. Essentially, the operator reaches around the shield on both sides, picks up a detonator with her left hand, picks up a primer with her right hand, inserts the primer in the detonator, places this assembly on the staking device located in the center of the table, withdraws her hands behind the shield, presses two levers (one with each hand) to activate the staking device, and then withdraws the assembled product from the staking device.

8. Beginning in May of 1973, DCASR safety personnel conducted quarterly post-award safety surveys at Action's Large Street plant. These inspections lasted from 8:00 a. m. until lunchtime or later, and were directed at safety hazards that could potentially interfere with any of the production schedules set out in the government contracts held by Action.

9. The inspector conducting a post-award survey would check in, inquire whether Action had been awarded any new contracts, inquire whether any recent unreported accidents had occurred, tour the plant, talk to Wojtas or one of the men assigned to him about Action's safety record in recent weeks, and, beginning in 1974, talk to Wojtas about the Procedures Evaluation check-list that Wojtas had developed. DCASR inspectors had no authority to compel changes in Action's operating procedures.

10. On May 10, 1973, Everett L. Graham, a Safety Officer in the Specialized Safety and Flight Operations Division of DCASR's Directorate of Quality Assurance, conducted a post-award safety survey at Action. Graham's report on his visit (Plaintiff's Exhibit 8) noted that an excessive quantity of explosive material was found "at the reject inspection station in room 7," and that Action should develop and post clearly written standard operating procedures for the guidance of its employees.

11. Beginning in July of 1973 or shortly thereafter, copies of the reports on post-award inspections were routinely sent to E. J. Slade, the Administrative Contracting Officer (ACO) at DCASR.

12. On July 16, 1973, Leo A. Everett conducted a post-award safety survey at Action. Everett's report on his visit (Plaintiff's Exhibit 6) noted that he observed a posted limit of 400 units—50 detonators and 350 primers—at the staking operation, and recommended that, in order to comply with certain safety requirements incorporated in the contract, Action "[i]nstall an effective operational shield at the M106 primer staking operation and substantially reduce the quantity of primers at this location."

13. On August 27, 1973, E. J. Slade, the Administrative Contracting Officer of DCASR, wrote to Joseph C. Brenner, Action's Contracts Manager, repeating Everett's recommendations and asking to be notified of Action's proposed corrective measures within twenty days. Plaintiff's Exhibit 28.

14. On September 13, 1973, Brenner wrote to Slade, stating that corrective action had already begun and that "completion is anticipated within the next 3–4 weeks." Plaintiff's Exhibit 29. These corrective measures were never completed, however.

15. On October 23, 1973, A. K. Siler, a Safety Specialist with DCASR, conducted a post-award safety survey at Action. On November 14, 1973, Slade wrote to Brenner, repeating the recommendations made in Siler's report, one of which was that Action "[i]nstall effective operational shields at stations as indicated in survey report of 19 July 1973." Plaintiff's Exhibit 30. Slade requested immediate corrective action and asked to be notified of proposed or completed corrective action within ten days.

16. On November 28, 1973, Brenner wrote to Slade, stating that explosives limits had been posted at the operating stations, and that Action had ordered material for the operational shields, which would be installed as soon as the material was received. Plaintiff's Exhibit 31.

17. On January 15, 1974, Siler conducted a post-award safety survey at Action. On February 8, 1974, Slade wrote to Brenner, repeating the recommendations contained in Siler's report. In particular, Slade stated:

"Procured fasteners for operational shields should be tested and, if results acceptable installed as soon as possible. Since reliable data proving the adequacy of the shields is not available, the proposed design should be tested with at least 25% overload before its use is permitted in operations."

Slade also requested that Brenner advise him of proposed corrective measures within twenty days.

18. On February 20, 1974, Brenner replied to Slade's letter of February 8. In particular, Brenner stated:

"A quantity of 25 each M48 Detonators were placed on a steel plate and fired, the fasteners on the operational shield held firm and fast and are therefore considered to be satisfactory."

19. At about the same time, George W. Hoffnagle, Action's Plant Manager, told Everett that he had conducted this test. Everett knew that the Department of Defense Contractor's Safety Manual for Ammunition, Explosives and Related Dangerous Material (Plaintiff's Exhibit 1, ¶ 603(f)) required a test using a twenty-five percent overload, and that a proper test for the staking operation shield would thus have employed five hundred units rather than twenty-five. Everett knew that the manual's requirement had not been complied with, but he simply forwarded the information to Slade without attempting to correct Hoffnagle's mistaken impression of what was required by the manual.

20. On May 9, 1974, Everett conducted a post-award safety survey at Action. On June 10, 1974, Slade wrote to Brenner, repeating the recommendations made in Everett's report. These recommendations dealt with the need for more emergency exits and the need to resurface and test the conductive flooring. Everett made no recommendation in regard to proper testing of the operational shield. Slade also requested that Brenner advise him of proposed corrective measures within twenty days. Plaintiff's Exhibit 32.

21. On June 25, 1974, Brenner wrote to Slade, stating that additional exits would be installed "when plans and specifications have been firmed up and released," and that the conductive flooring would be resurfaced as soon as Action received the special paint it had ordered for that purpose. Plaintiff's Exhibit 33.

22. On August 5, 1974, plaintiff's decedent, Willie Mae Toole, was performing the staking operation on the M412 fuzes at her work station in the "loading plant" area of Action. At about 10:32 a. m., an explosion occurred on her work table. The explosion caused extensive damage to the work station. Mrs. Toole was thrown backward by the force of the blast, and landed on the floor three or four feet behind her work bench. She was gravely injured by the explosion, and she died in the hospital on August 20, 1974 as a result of those injuries.

23. The posted explosives limit of 400 units at Mrs. Toole's work station encompassed a tray of 50 detonators and a cup containing 350 primers. In the explosion on August 5, 1974, seven of the detonators, all the primers in the cup, and the fuze assembly on which Mrs. Toole was working all exploded.

24. On August 8, 1974, Harry A. Dittman, a DCAS Safety Specialist, conducted an accident investigation at Action. Dittman "reminded" Action personnel that the Department of Defense manual required that the work station, or barricade, as well as the shield and the fasteners, be tested with a twenty-five percent overload of explosives. In his report on the visit, Dittman concluded:

"The immediate cause of the functioning of the fuze assembly being staked was not conclusively determined . . . However, it is concluded that the large number of explosives components directly exposed to the staking operation and the inadequacy of the operational shields for

the quantity of explosives involved contributed heavily to the *severity* of the accident."

Plaintiff's Exhibit 3, at 3 (emphasis in original).

25. On October 23, 1974, Everett conducted a post-award safety survey at Action. On November 8, 1974, Slade wrote to Brenner, repeating the recommendations set out in Everett's report. In particular, Slade requested that Action "[d]ecrease the explosives limit and shield the M106 primer punch out operation to provide adequate protection for the operator's transients." Slade also requested that Brenner advise him of proposed corrective measures within fifteen days. Plaintiff's Exhibit 36.

26. On November 21, 1974, Brenner wrote to Slade, stating that "[a]n operational shield booth of the type recently constructed for the staking operation" was being used at the station where the primers were punched out of their shipping boards. Plaintiff's Exhibit 37.

27. When Slade learned that a recommendation made by a DCASR safety inspector was not being implemented, it was his usual practice to write to the contractor and request that corrective action be taken within a specified time. If no action resulted, Slade would investigate the matter. If no good reason for the inaction became evident, Slade would advise the Procurement Contracting Officer (PCO), who had the sole power to terminate the contract for noncompliance with safety regulations.

28. In deciding whether to recommend to the PCO that a contract be terminated, Slade would take into consideration (1) the nature of the noncompliance, (2) whether or not the noncompliance was deliberate, and (3) the actual safety hazard resulting from the noncompliance.

29. DCASR's safety inspection program was limited to assuring compliance with contractual safety requirements. Moreover, its primary purpose was to protect the contractor's production capability, rather than to protect the contractor's employees. A subsidiary purpose of the program was to protect the government employees who worked on the contractor's premises. In some cases, the contractor's own employees were incidental beneficiaries of the DCASR program, but the contractor was generally understood to be responsible for its own employees' safety.

30. Action retained complete control of the manner in which work was conducted in its plant. DCASR safety personnel had no authority to compel changes in Action's operating procedures. When DCASR personnel made safety recommendations, however, Action's policy was to comply with any recommendation that was within reason. Although it was generally understood that the government could suspend production, or even terminate the contract, for noncompliance with contractual safety requirements, these sanctions were used infrequently, if at all. Action's ready acceptance of DCASR safety recommendations stemmed from a desire to maintain good business relations with the United States, which supplied approximately seventy-five percent of Action's business, as well as from a desire to protect its own employees.

31. Several years before the contract at issue here was awarded, Action received another government contract for the manufacture of a different fuze. The United States supplied Action with barricades, or work stations, at which various operations in the assembly process were to be performed, and over a period of several years Action found the government-supplied barricades to be satisfactory. In 1973, Action was awarded the contract at issue here. Because the staking operation on the M412A1 fuze would be performed in a barricade containing a quantity of explosives equivalent to the quantity maintained during fuze assembly under the earlier contract, Action concluded that the barricade supplied for the earlier contract would be suitable for the staking operation. At the time of the explosion on August 5, 1974, the barricade at which Mrs. Toole was working either had been supplied to Action by the United States or had been assembled by Action, using a government-supplied barricade as a model. (Deposition of Harry Stern, President of Action)

32. Following the explosion on August 5, 1974, certain changes were made in the way the staking operation was conducted. Dittman's report on his August 8, 1974 visit recommended that Action:

—place a local shield around the staking device itself,

—reduce the quantity of explosives maintained at that work station to 50 detonators and 200 primers, and

—redesign the barricade, or work station, to protect the operator and shield any explosives stored nearby.

Plaintiff's Exhibit 3. Dittman never visited Action prior to the accident, but he testified at trial that he would have made the same recommendations before the accident if he had had an opportunity to study Mrs. Toole's work station.

33. The barricade, or work station, was ultimately redesigned to afford greater protection to the operator and to insure that any accidental explosion would not spread to the detonators and primers that the operator kept on top of the work table. In addition, the explosives limit for the work station was reduced to 50 detonators and 100 primers, and these units were required to be stored in individual compartments of a tray, rather than in a single cup.

34. The post-accident changes in the staking operation were determined after discussions among Lieutenant Colonel Walter M. Nickens, Chief of the Specialized Safety and Flight Operations Division of DCASR's Directorate of Quality Assurance, Max Rubin, Action's safety consultant, and others. Action sent reports on its design proposals to Colonel Nickens, and he returned these reports to Action with his comments or recommendations. Colonel Nickens testified at trial that Action did not need his approval of the new barricade design in order to resume production of the fuze rockets, but Rubin's testimony made it plain that Action nevertheless sought the government's prior approval of their new design. Action did this because, under their contract, the government's dissatisfaction with the barricade (from a safety point of view) might justify its refusal to accept Action's fuze rockets until the barricade was redesigned.

35. The contract between the United States and Action stated, with respect to the M412A1 fuze, that applicable "[s]afety limitations and precautions" were contained in the Defense Department's Contractor's Safety Manual (DOD Manual 4145.26M), and that "[a]ll special requirements usually associated with electrical detonators and stab primers" were to be observed. With respect to the M48 detonator, the contract listed the following special requirements:

"Operational shields are required. All equipment must be bonded and grounded. Quantities must be limited to [o]perational needs. All personnel handling the M48 Detonators must be properly grounded."

Plaintiff's Exhibit 1, at 15.

With respect to the M106 primer, the contract listed the following special requirements:

"All equipment must be bonded and grounded. Quantities must be limited to operating needs."

Plaintiff's Exhibit 1, at 16.

With respect to both the primer and the detonator, the contract stated that "all safety precautions must be observed."

36. The contract between the United States and Action incorporated by reference Armed Services Procurement Regulation 7–104.79, 32 C.F.R. § 7–104.79 (1975), which provides in part:

"(b) The Contractor shall comply with the DOD Contractor's Safety Manual for Ammunition, Explosives and Related Dangerous Materials (DOD Manual 4145.-26M) [Plaintiff's Exhibit 1], in effect on the date of the solicitation for this contract, as it relates to ammunition and explosives, and any other additional or more stringent requirements included in the schedule of this contract. If the Contracting Officer notifies the Contractor of any noncompliance with such Manual, or schedule provisions, the Contractor shall immediately take corrective action. If the Contractor fails or refuses to take corrective action within the time speci-

fied by the Contracting Officer, the Contracting Officer may direct the Contractor to cease performance on all or part of this contract, or until satisfactory corrective action has been taken. Any notification or direction under this paragraph should be in writing or confirmed in writing by the Contracting Officer. The Contracting Officer may at any time remove Government personnel whenever the Contractor is in noncompliance with the safety requirements of this clause. Either action by the Contracting Officer shall not entitle the Contractor to an adjustment of the contract price or other reimbursement for resulting increased costs, or to an adjustment of the delivery or performance schedule. However, should direction to cease performance be issued or Government personnel be removed and it is later determined that the Contractor had, in fact, complied with the Manual, or schedule provisions, the Contractor shall be entitled to an equitable adjustment in delivery schedule, in contract price, or both, in accordance with the procedures provided for in the clause of this contract entitled 'Changes.'

. . . .

(d) Neither the requirements of this clause nor any act or failure to act by the Government in surveillance or enforcement thereof shall affect or relieve the Contractor of responsibility for the safety of his personnel and his property and for the safety of the general public in connection with the performance of this contract, or impose or add to any liability of the Government for such safety. The Contractor is not entitled to rely on the requirements of this clause or on any Government surveillance or enforcement thereof, or lack thereof, or granting of any waiver or exemption in accordance with DOD 4145.26M in discharging the Contractor's responsibility.

. . . .

(f) Nothing contained herein shall relieve the Contractor from complying with applicable federal, state and local laws, codes, ordinances and regulations (including the obtaining of licenses and permits) in connection with the performance of this contract."

37. The Defense Department manual (DOD Manual 4145.26M) referred to in the above regulation provides in part:

"100. Purpose

The purpose of this manual is to set forth safe practices and standards for all work performed in connection with DoD contracts involving ammunition, explosives and related dangerous materials. This manual also prescribes safe methods, practices, and standards for insuring continuity of production, safeguarding personnel, and preventing property damage at contractor operated plants.

. . . . . .

103. Responsibilities

a. The Procuring Contracting Officer (PCO) is responsible for:

(1) Providing safety clauses and technical safety data in contracts for ammunition, explosives and related dangerous materials, using this manual, in whole or in part, as appropriate.

(2) Seeking counsel or advice of the cognizant DoD Component safety staff to insure that adequate safety criteria is included in the contract.

(3) Having pre-award safety surveys conducted to determine that the contractors can meet the applicable criteria contained herein.

(4) Evaluating conditions found during pre-award surveys of contractors plants. When the applicable safety criteria cannot be met, and only upon authority of the cognizant DoD Component, amend the contract to reflect the authorized waivers or exemptions (see para 104).

(5) Requiring the contractor to provide site and construction plans for review under conditions set forth in paragraph 105.

b. The Administrative Contracting Officer (ACO) is responsible for:

(1) Assuring that the contract contains safety clauses and technical safety data

and that the contractor complies with same; reporting noncompliance to the PCO.

(2) Seeking advice of the safety organization of cognizant DoD Component on matters relating to safety.

(3) Performing pre-award safety surveys when requested by the PCO.

(4) Forwarding requests for waivers or exemptions in accordance with para 104, with appropriate recommendations.

. . . . .

603. Specialized Safety

This paragraph establishes specific safe practices and procedures for ammunition, explosives, and other dangerous material that are not contained elsewhere in this manual.

. . . .

b. *Personnel and Materials (Explosive) Limits.*

(1) The cardinal principle to be observed in any location or operation involving explosives, ammunition, severe fire hazards or toxic materials is to limit the exposure of minimum number of personnel, for a minimum time, to a minimum amount of the hazardous material consistent with safe and efficient operations. All operations shall be scrutinized to devise methods for reducing the number of people exposed, the time of exposure, or the quantity of material subject to a single incident.

. . .

(2) Determination of limits for hazardous materials requires a careful analysis of all facts including operation timing, transportation methods, size of the items, and the chemical and physical characteristics of the material. More strict limits are required for the more sensitive or hazardous materials. Limits should be established for each operation rather than on an overall basis so that each worker may be charged with the responsibility of not exceeding the established limit. . . .

. . . .

f. *Operational Shields.*

(1) Certain operations are hazardous and operational shields must be used for the protection of employees. The requirements for shielding cannot be clearly defined because of the great variety of circumstances that surround a given operation. The safety of operations will depend on the careful scrutiny of the work planned and the far-sightedness of those responsible for safety in the establishment. Dependent upon amounts of explosives, operations being performed and other factors, shields may be constructed of concrete, steel, wood, plexiglass, or other construction materials.

(2) Operational shields for the protection of personnel shall be designed taking into account thickness, size, fastening, and location in such a manner as to protect against the effects of not less than a 25 percent overload above the expected maximum charge. In the absence of reliable data proving the adequacy of these shields, the proposed design shall be tested with at least this 25 percent overload before its use is permitted in operations. Operational shields for which adequate test data is available need not be retested for each specific exposure of the same magnitude.

. . . . .

709. Class 7 (Mass Detonating Hazards)

Items in this class shall be those, most of the entire quantity of which will explode virtually instantaneously when a small portion is subject to fire, to severe concussion or impact, to the impulse of an initiating agent, or to the effect of a considerable discharge of energy from without. Such an explosion normally will cause severe structural damage to adjacent objects and the simultaneous explosion of other separated explosives and ammunition placed sufficiently close to the initially-exploding pile."

38. Action owned and operated the Large Street plant in its entirety.

## DISCUSSION

In 1946, Congress enacted the Federal Tort Claims Act, and thereby waived the United States' immunity from suit on

"claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1970).

The Act further provides that the United States "shall be liable, [in a suit brought on such a claim] in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674 (1970).

▅▅▅ The issue in this case is whether the United States may properly be held liable for the death of plaintiff's decedent. At the outset, I note that since the complained-of acts and omissions occurred in Pennsylvania, the issue of liability is governed by Pennsylvania law. *E. g., Fisher v. United States*, 441 F.2d 1288, 1289 (3d Cir.

1971); 28 U.S.C. § 1346(b) (1970). Before liability can be imposed on the United States, the plaintiff must show that one of its employees breached a legal duty owed to plaintiff's decedent, and that that breach proximately caused her death. *See* W. Prosser, Torts § 30, at 143 (4th ed. 1971); Restatement (Second) of Torts § 281 (1965). The United States argues that it owed no duty to the plaintiff's decedent. The plaintiff advances several theories in support of his contention that the United States did owe such a duty, and these theories will be considered in turn.

*Negligence Per Se—Violation of Statute*

First, the plaintiff argues that the United States violated the Walsh-Healey Act, 41 U.S.C. §§ 35–45 (1970), and the regulations issued thereunder by the Secretary of Labor, 41 C.F.R. §§ 50–201.1 to 50–210.1 (1977), and that these violations amounted to negligence per se. *See generally* Restatement (Second) of Torts §§ 286–288C (1965). Although the negligence per se analysis has been adopted by the Pennsylvania courts,[1] the plaintiff's argument along these lines cannot succeed.

Section 1 of the Walsh-Healey Act, set out in the margin,[2] requires that federal

---

1. *See, e. g., Manning v. Andy*, 454 Pa. 237, 240, 310 A.2d 75, 76 (Pomeroy, J., concurring) (1973); *Majors v. Brodhead Hotel*, 416 Pa. 265, 268, 205 A.2d 873, 875 (1965); *Jardine v. Upper Darby Lodge No. 1973, Inc.*, 413 Pa. 626, 632, 198 A.2d 550, 553 (1964).

2. Section 1 of the Walsh-Healey Act, 41 U.S.C. § 35 (1970), provides:

"§ 35. Contracts for materials, etc., exceeding $10,000; representations and stipulations

In any contract made and entered into by any executive department, independent establishment, or other agency or instrumentality of the United States, or by the District of Columbia, or by any corporation all the stock of which is beneficially owned by the United States (all the foregoing being hereinafter designated as agencies of the United States), for the manufacture or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,-000, there shall be included the following representations and stipulations:

(a) That the contractor is the manufacturer of or a regular dealer in the materials, supplies,

articles, or equipment to be manufactured or used in the performance of the contract;

(b) That all persons employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract;

(c) That no person employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight hours in any one.day or in excess of forty hours in any one week: *Provided,* That the provisions of this subsection shall not apply to any employer who shall have entered into an agreement with his employees pursuant to the provisions of para-

procurement contracts, such as the one awarded to Action in this case, contain certain "representations and stipulations." The required representations include minimum-wage and maximum-hour standards governing the performance of the contract, as well as a proviso that no part of the contract will be performed under working conditions that are hazardous or dangerous to the contractor's employees. Section 2 of the Act, set out in the margin,[3] provides that a contractor who breaches any of the required representations contained in a government contract shall be liable to the United States for statutory liquidated damages.

■ Although the plaintiff has not elaborated on the alleged violations of the Act, his position apparently is that the United States violated section 1 of the Act in that it failed to "enforce safe working conditions at Action." Plaintiff's Memorandum of Law at 3. The difficulty with this argument is that the essential element of any negligence per se analysis—the violation of a statute—is lacking. *See* Restatement (Second) of Torts § 288B(1) (1965). By its terms, the Act requires only that a safety representation be included in the contract. If that representation is included but is not honored, this may amount to a breach of the contract, but the Act itself is not violated. The failure of the United States to enforce the safety representation in Action's contract therefore cannot be treated as negligence per se.

■ The plaintiff also argues that the United States, by failing to enforce safe working conditions at Action, violated "regulations passed pursuant [to]" the Walsh-Healey Act. Plaintiff's Memorandum of Law at 3. I have examined the Secretary of Labor's interpretative regulations on safety and health standards for federal sup-

graphs (1) or (2) of subsection (b) of section 207 of Title 29;

(d) That no male person under sixteen years of age and no female person under eighteen years of age and no convict labor will be employed by the contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in such contract; and

(e) That no part of such contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of said contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection."

**3.** Section 2 of the Walsh-Healey Act, 41 U.S.C. § 36 (1970), provides:

"§ 36. Same; liability for breach; cancellation; completion by Government agency; employee's wages

Any breach or violation of any of the representations and stipulations in any contract for the purposes set forth in section 35 of this title shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of such contract, the sum of $10 per day for each male person under sixteen years of age or each female person under eighteen years of age, or each convict laborer knowingly employed in the performance of such contract, and a sum equal to the amount of any deductions, rebates, refunds, or underpayment of wages due to any employee engaged in the performance of such contract; and, in addition, the agency of the United States entering into such contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original contractor. Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of said contract set forth in section 35 of this title may be withheld from any amounts due on any such contracts or may be recovered in suits brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered: *Provided*, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the contractor of the withholding or recovery of such sums by the United States of America."

ply contracts, 41 C.F.R. §§ 50–204.1 to –205.10 (1977), and I am convinced that, although the negligence per se theory is applicable to violations of administrative regulations,[4] the objection set out earlier with respect to violations of the Act itself applies with equal force to the plaintiff's argument based on violations of these regulations. The regulations serve primarily to elaborate upon the requirements imposed by the Act; inasmuch as the United States did not violate the Act, it follows that the United States also did not violate the regulations. Accordingly, I must reject the plaintiff's negligence per se argument based on these regulations.

The plaintiff's remaining negligence per se argument is based on the Act of May 18, 1937, Act No. 174, 1937 Pa.Laws 654, and the regulations issued pursuant thereto by the Pennsylvania Department of Labor and Industry. Although the plaintiff has not specified which sections of the Act he believes were violated, section 4 appears to be particularly relevant here. Section 4 provides that all "establishments"[5] in which explosives are manufactured or stored "shall be located, erected, operated, and conducted as to provide adequate and reasonable protection to persons employed therein." Pa.Stat.Ann. tit. 43, § 25–4 (Purdon 1964).

The plaintiff argues that the United States violated section 4, and that liability should be imposed on the Government on a negligence per se theory. Although the Pennsylvania courts have recognized that a violation of the Act amounts to negligence per se,[6] the plaintiff's argument based on this theory cannot succeed. The United States was neither Mrs. Toole's employer, nor was it the owner or the lessee of the

plant where she worked; furthermore, the plant was under the sole control of Action at all times. Under these circumstances, the Act imposed no duty whatsoever on the United States,[7] and therefore the United States did not violate the Act.

With respect to the interpretative regulations issued pursuant to the Act, the plaintiff has again failed to specify the regulation(s) that allegedly were violated here. I have examined the Department of Labor and Industry regulations pertaining to explosives safety, 34 Pa.Code §§ 5.81 to 5.193, and I find no provision therein that was even arguably violated here. Moreover, any violation that occurred would be attributable to Action rather than to the United States, for the reason stated above. Accordingly, I cannot accept the plaintiff's negligence per se arguments.

*The Contract as a Dangerous Chattel*

The plaintiff argues further that the contract awarded to Action by the United States was a dangerous chattel within the meaning of section 388 of the Restatement (Second) of Torts, which provides:

"§ 388. Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be danger-

---

**4.** *See* Restatement (Second) of Torts §§ 285–288C (1965).

**5.** Section 1 of the Act, Pa.Stat.Ann. tit. 43, § 25–1 (Purdon 1964) provides in part:

"The term 'establishment' shall mean any room, building or place within this Commonwealth where persons are employed or permitted to work for compensation of any kind to whomever payable, except farms or private dwellings, and shall include those owned or

under the control of the Commonwealth, and any political subdivision thereof, as well as school districts."

**6.** *O'Neill v. United States,* 411 F.2d 139, 143 & n. 6 (3d Cir. 1969) (collecting cases).

**7.** *Compare Heichel v. Lima-Hamilton Corp.,* 98 F.Supp. 232, 238 (N.D.Ohio 1951) *with Wiseman v. United States,* 327 F.2d 701, 706–07 (3d Cir. 1964).

ous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

Because the United States knew at the time it awarded the contract that unsafe conditions pertained at Action, the argument runs, the contract was a chattel "dangerous for the use for which it [was] supplied." Although section 388 has been adopted by the Pennsylvania courts,[8] the plaintiff's novel argument based on that section is unpersuasive. The illustrations and comments accompanying section 388 make it abundantly clear that liability will be imposed only where the object supplied is itself dangerous for its intended use. *Compare* Comment b, Illustration 1 (shotgun) *and* Comment g, Illustration 2 (drug) *with* Comment i, Illustration 4 (ladder). In this case, the contract itself—the 64 page document introduced in evidence at trial—posed no danger to anyone. True, the work that was the *subject* of the contract was dangerous, and ultimately led to the tragic death of the plaintiff's decedent. The work, however, cannot be characterized as a chattel, and the contract, which can be so characterized, was not dangerous. Accordingly, the plaintiff cannot recover under section 388 of the Restatement (Second).

*Section 413(a) of Restatement (Second)*

 The plaintiff also argues that the United States is liable under section 413(a) of the Restatement (Second) of Torts. Section 413 provides:

"§ 413. Duty to Provide for Taking of Precautions Against Dangers Involved in Work Entrusted to Contractor

One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer

(a) fails to provide in the contract that the contractor shall take such precautions, or

(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

Although section 413 has been adopted by the Pennsylvania courts,[9] the plaintiff's argument based on that section must fail. Subsection (a) of section 413 imposes liability where the employer of an independent contractor fails to provide in the contract that the appropriate special precautions shall be taken. The plaintiff argues that at the time the contract was awarded, the United States knew that Action used an unsafe (government-supplied) barricade, or work station, at the staking operation in the fuze assembly process. In the face of this information, the argument runs, the United States "did not specify in the contract with Action what a safe barricade was and require Action to provide such described safe barricade." Plaintiff's Memorandum of Law at 4. The plaintiff readily admits, however, that sections 603(b) and 603(f)(2) of the Defense Department Contractor's Safety Manual for Ammunition, Explosives and Related Dangerous Material (plaintiff's Exhibit 1), incorporated by reference in the contract, required Action to (a) establish an explosives limit for Mrs. Toole's work station that would minimize her exposure, and (b) test the operational shield at her work station with a twenty-five percent overload "above the expected maximum charge" before permitting her to begin work behind that shield. Plaintiff's Memorandum of Law at 4–5.

**8.** *See, e. g., Incollingo v. Ewing,* 444 Pa. 263, 288 n. 9, 282 A.2d 206, 220 n. 8 (1971); *Thomas v. Arvon Prods. Co.,* 424 Pa. 365, 370, 227· A.2d 897, 900 (1967); *Thomas v. Ribble,* 404 Pa. 296, 299–300, 172 A.2d 280, 282 (1961).

**9.** *See Brietich v. United States Steel Corp.,* 445 Pa. 525, 533–35, 285 A.2d 133, 137 (1971); *Gonzalez v. United States Steel Corp.,* Pa.Super., 374 A.2d 1334 (1977).

Insofar as the plaintiff's complaint is that the United States, having included these requirements in the contract, failed to use due care in *enforcing* them, section 413(a) of the Restatement (Second) is plainly unavailable as a basis for imposing liability on the Government. Chief Judge Foley's painstaking opinion in *McGarry v. United States,* 370 F.Supp. 525 (D.Nev.1973), *rev'd in part on other grounds,* 549 F.2d 587 (9th Cir. 1976), *cert. denied,* —— U.S. ——, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), cited by the plaintiff, is not to the contrary, for there the Government was held liable under Nevada law on a nondelegable duty theory not found in the Restatement (Second). 370 F.Supp. at 555–56. If, on the other hand, the plaintiff's theory is that the requisite "special precautions" in this case should have included a detailed description of a safe barricade, the end result is not different. The plaintiff has not carried his burden of proving that Mrs. Toole's death was proximately caused by the inclusion in the contract of the Defense Department manual's general requirements rather than a detailed description of a safe barricade. *See, e. g., Cuthbert v. Philadelphia,* 417 Pa. 610, 614–15, 209 A.2d 261, 263–64 (1965) (citing cases). Accordingly, the plaintiff cannot recover under section 413(a) of the Restatement (Second).

### Section 416 of Restatement (Second)

■ The plaintiff's next argument is based on section 416 of the Restatement (Second) of Torts, which provides:

"§ 416. Work Dangerous in Absence of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them *by the failure of the contractor to exercise reasonable care* to take such precautions, even though the employer has provided for such precautions in the contract or otherwise." (Emphasis added.)

The plaintiff apparently concedes that the waiver of immunity contained in the Federal Tort Claims Act does not extend to claims based on vicarious liability for the negligence of one not employed by the United States. *See, e. g., Gibson v. United States,* 567 F.2d 1237, 1242–43 (3d Cir. 1977); *Thorne v. United States,* 479 F.2d 804 (9th Cir. 1973) (by implication); *Emelwon, Inc. v. United States,* 391 F.2d 9, 10 (5th Cir. 1968); *United States v. Page,* 350 F.2d 28, 33–34 (10th Cir. 1965); *McGarry v. United States, supra,* 370 F.Supp. at 555, 563–64. In order to avoid this limitation, he urges that section 416 states a rule of personal liability as well as a rule of vicarious liability, *i. e.,* that the employer of a negligent independent contractor may properly be held liable for his own negligence under section 416. This contention is refuted, however, by the plain language of section 416, by the Reporter's Introductory Note to sections 416 through 429,[10] and by the consistent holdings of the Pennsylvania courts.[11] Because section 416 imposes vicarious liability, it is unavailable to a plaintiff proceeding under the Federal Tort Claims Act. *Gibson v. United States,* 567 F.2d 1237, 1243–44 (3d Cir. 1977); *McGarry v.*

---

**10.** The first paragraph of the Introductory Note to chapter 15, topic 2 of the Restatement (Second) states:

"The rules stated in the following §§ 416–429, unlike those stated in the preceding §§ 410–415, do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the

responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant."

**11.** *See, e. g., Moss v. Swann Oil, Inc.,* 423 F.Supp. 1280, 1283 (E.D.Pa.1977); *Philadelphia Elec. Co. v. Julian,* 425 Pa. 217, 228 A.2d 669 (1967); *Gonzalez v. United States Steel Corp.,* Pa.Super., 374 A.2d 1334, 1339 (1977); *McDonough v. United States Steel Corp.,* 228 Pa.Super. 268, 274, 324 A.2d 542, 545 (1974).

*United States, supra,* 370 F.Supp. at 555, 563–64.

### Section 410 of Restatement (Second)

The plaintiff also contends that the United States is liable under section 410 [12] of the Restatement (Second), which provides:

> "410. Contractor's Conduct in Obedience to Employer's Directions
>
> The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself."

In particular, the plaintiff argues that this case fits within Illustration 1 to section 410. Illustration 1 reads as follows:

> "A, the owner of a city lot, employs B to erect for him a row of small shops. These buildings are erected under plans and specifications which a reasonably careful and competent man would recognize as making the buildings likely to fall and injure persons in the street, although they might stand for a considerable time. One of these buildings collapses and falls upon C, a passerby on the adjacent highway. A is subject to liability to C."

According to the plaintiff's interpretation of Illustration 1, B, the contractor, prepared the plans and specifications for the buildings, and yet A, the employer, "had the responsibility to examine said plans and specifications and the employer was responsible for damages resulting from said inadequate plans and specifications." Plaintiff's Memorandum of Law at 9. Similarly, the plaintiff argues, the United States is responsible for damages resulting from Action's dangerous operating procedures, which included (a) an inadequate barricade, and (b) excessive quantities of explosives within that barricade.

Although section 410 is available to the plaintiff as a theory of liability under Pennsylvania law,[13] the plaintiff has interpreted Illustration 1 as stating a much broader rule of liability under section 410 than is supported by either the comments to that section or the cases that rely on it. True, Illustration 1 fails to state whether A or B prepared the plans for the buildings. The comments to section 410, however, are simply inconsistent with the sweeping rule of liability advocated by the plaintiff. Comment b, for example, states in part:

> "The liability is based upon the fact that the employer has been negligent in directing his contractor to do work which is dangerous in itself or in the manner in which it is done. Therefore, the employer is subject to liability, under the rule stated in this Section, for only such physical harm as is caused by the dangerous character of the work or the dangerous manner in which it is directed to be done. *He is not subject to liability for any harm caused by some improper method which the contractor, without any direction of his employer, adopts in doing the work.*" (Emphasis added.)

The final sentence of comment b indicates rather clearly that liability based on the contractor's use of improper methods will not be imposed unless the contractor acted at the direction of the employer. In short, the more likely interpretation of Illustration 1 is that A, the employer, negligently supplied B with faulty plans, and therefore is liable for injuries that occur after B follows those plans.

The correct rule of liability under section 410 of the Restatement (Second) is illustrated by *Weldon v. Steiner,* 138 Pa.Super. 66, 10 A.2d 19 (1939), a Pennsylvania decision that relied on section 410 of the first Restatement of Torts, which is virtually identical to the present section 410. Steiner desired to have a large sign erected over the entrance to his premises, and he retained Marback, an independent contractor,

---

12. Section 410 does not state a rule of vicarious liability. *See* Restatement (Second) of Torts § 410, Comment h (1965).

13. *See Gonzalez v. United States Steel Corp.,* Pa.Super., 374 A.2d 1334 (1977).

for this purpose. During the course of his work, Marback advised Steiner that the wind velocity had become too great for the work to proceed safely, "but Steiner insisted that notwithstanding the apparent danger the work should be speeded up and gave his assistance in so doing." 138 Pa.Super. at 70, 10 A.2d 21. Shortly thereafter, the wind blew over a ladder that was being used in the work, and the ladder struck and injured Weldon, who was passing by on the sidewalk. Weldon obtained a jury verdict against both defendants, and the trial court "entered judgment n. o. v. for defendant, Paul Steiner, on the ground that John Marback, the other defendant, was an independent contractor and therefore was alone liable for the injuries inflicted upon the plaintiff." 138 Pa.Super. at 68, 10 A.2d 20. The Superior Court reversed and ordered judgment entered on the original verdict, stating that Steiner, by *interfering* with the manner in which Marback performed the work, had forfeited the immunity that an employer usually enjoys from the consequences of an independent contractor's negligence. By its repeated use of the term "interference," and by its quotation of section 410 of the first Restatement, which speaks of "orders or directions negligently given by the employer," the court isolated the precise basis for liability in a case of this kind. That basis, simply stated, is that the contractor acted pursuant to the employer's negligent orders or directions. *Accord, Lasch v. Cohn*, 130 Pa.Super. 161, 196 A. 581 (1938).

Finally, the theory advanced by plaintiff, which would require the employer, at his peril, to substitute his judgment on technical matters bearing on safety for that of the independent contractor, runs counter to the general rule that "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." Restatement (Second) of Torts § 409 (1965). The Pennsylvania Supreme Court has stated the policy considerations underlying this rule:

"The man of average prudence who engages another to do an important piece of lawful work will have a care that the man so engaged is fitted for his tasks, and, when thus reasonably assured, he engages him as an individual contractor, he should not be held responsible for the negligence of that contractor and the latter's workmen. Should the doctrine be generally adopted that, whenever work is to be done that may in the doing endanger others, the party for whom it is being done shall be held responsible for negligence in the manner of doing it, any man having important work of construction or destruction to do would hesitate about entrusting it to anybody. Such a doctrine, if enforced, would lead to business stagnation. Railroad executives would hesitate to engage a contractor to blast a way through a rock cut because blasting is generally held to be 'inherently dangerous,' and the railroad would be held responsible for accidents resulting from the blasting. In every growing city old buildings are being continually torn down. From the doing of this work injurious consequences might be expected to arise unless the greatest care is taken. Must the owner of the property who ordinarily knows nothing about the art of razing buildings be held responsible for injuries resulting from carelessness in doing the work entrusted to a competent building wrecker? . . .

. . . . .

The very phrase 'independent contractor' implies that the contractor is independent in the manner of doing the work contracted for. How can the other party control the contractor who is engaged to do the work, and who presumably knows more about doing it than the man who by contract authorized him to do it? Responsibility goes with authority."

*Silveus v. Grossman*, 307 Pa. 272, 276–78, 161 A. 362, 364 (1932). True, the general rule has become riddled with exceptions. *See* Restatement (Second) of Torts §§ 410–29 (1965). It remains the rule, however, "where no good reason is found for depart-

ing from it." Restatement (Second) of Torts § 409, Comment b (1965). I see no reason to expand the rule of liability stated in section 410 to the sweeping rule contended for by the plaintiff. Accordingly, as the United States did not direct Action to adopt the procedures challenged here, it cannot be held liable under section 410 for the injuries resulting from Action's adoption of those procedures.

### Section 411 of Restatement (Second)

The plaintiff's next contention is that liability should be imposed on the United States under section 411 of the Restatement (Second). Section 411 provides:

"§ 411. Negligence in Selection of Contractor

An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons."

Two distinct theories under section 411 are set out in the plaintiff's memorandum. First, the plaintiff contends that the United States negligently awarded the contract to Action, although it knew that Action's procedures and equipment were unsafe. Second, the plaintiff contends that the United States negligently permitted work under the contract to continue after its safety inspectors learned that Action had not properly tested the barricades used in its plant, and that Action permitted excessive quantities of explosives to be kept at the barricades.

Section 411 is apparently available as a theory of liability under Pennsylvania law,[14] although I have found no Pennsylvania authority dealing with negligent continuation of a contract, as opposed to negligent initial selection of a contractor.[15] Section 411 is not available, however, to a plaintiff proceeding under the Federal Tort Claims Act, for an entirely different reason.

■ Section 2680(a) of Title 28 provides that the waiver of immunity contained in the Federal Tort Claims Act shall not apply to any claim that is

"based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Accordingly, I must determine whether the United States employees who awarded Action this contract, and who permitted work thereunder to continue, were performing a discretionary function.

The leading decision on the "discretionary function" exemption is *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Justice Reed, writing for the Court in *Dalehite,* stated a broad rule for determining the applicability of this exception: "Where there is room for policy judgment and decision there is discretion." 346

---

**14.** See, e. g., *Brown v. Moore,* 247 F.2d 711, 718–19 n. 10 (3d Cir.) (by implication), *cert. denied,* 355 U.S. 882, 78 S.Ct. 148, 2 L.Ed.2d 112 (1957); *Hader v. Coplay Cement Mfg. Co.,* 410 Pa. 139, 151 n. 6, 189 A.2d 271, 277 n. 6 (1963) (dictum); *Fuller v. Palazzolo,* 329 Pa. 93, 106, 197 A. 225, 231 (1938); *Silveus v. Grossman,* 307 Pa. 272, 278–80, 161 A. 362, 364–65 (1932) (dictum); *McDonough v. United States Steel Corp.,* 228 Pa.Super. 268, 273–74, 324 A.2d 542, 545 (1974) (by implication). *See generally Hargrove v. Frommeyer & Co.,* 229 Pa. Super. 298, 312–13, 323 A.2d 300, 308–09 (1974). *See also Gilbert v. Korvette's, Inc.,* 457 Pa. 602, 611–12 n. 25, 327 A.2d 94, 100 n. 25 (1974) ("In recent years, this Court has not hesitated to adopt sections of the Restatement (Second) of Torts (1965) when our common-law precedents varied from the Restatement or when the Pennsylvania common law provided no answer.")

**15.** On this issue, see *Kuhn v. P. J. Carlin Constr. Co.,* 154 Misc. 892, 278 N.Y.S. 635 (1935), *aff'd mem.,* 248 App.Div. 582, 288 N.Y.S. 1110 (1936), *rev'd on other grounds,* 274 N.Y. 118, 130–34, 8 N.E.2d 300, 305–07 (1937). *But cf. Lipka v. United States,* 369 F.2d 288, 292–93 & n. 3 (2d Cir. 1966), *cert. denied,* 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967) (*Kuhn* decision does not allow recovery by an employee of the independent contractor).

U.S. at 36, 73 S.Ct. at 968. Although some later decisions have read the exception less broadly,[16] Justice Reed's opinion in *Dalehite* remains the touchstone.[17]

The Second Circuit, the Sixth Circuit, and the D.C. Circuit have considered the application of the discretionary function exemption in the area of government contracts, and their decisions are instructive here. In *Gowdy v. United States,* 412 F.2d 525 (6th Cir. 1969), the plaintiff, an employee of the independent contractor retained by the Coast Guard, argued, *inter alia,* that the Coast Guard had negligently chosen an incompetent contractor. The Government appealed from the district court's finding that the Coast Guard was negligent in another respect, and the Sixth Circuit reversed, giving alternative holdings:

> "There was no proof that Whittaker was an incompetent contractor, or that the Government had knowledge of any alleged incompetency. In any event, the award of contracts by the Government involves a 'discretionary function or duty,' in the exercise of which it is exempt from liability under the Federal Tort Claims Act." 412 F.2d at 529.

In *Scanwell Laboratories, Inc. v. Thomas,* 172 U.S.App.D.C. 281, 521 F.2d 941 (1975), the plaintiff, a disappointed bidder, argued that the Federal Aviation Administration had acted tortiously in awarding a certain contract to AIL, inasmuch as AIL's bid failed to comply with certain requirements set out in the FAA's invitation for bids. The FAA maintained that it was authorized to waive the unsatisfied requirements and award the contract to AIL. Scanwell appealed from the district court's dismissal of its tort claim against the Government, and the court of appeals affirmed. The court held, in the alternative, that the plaintiff's claim was one for negligent misrepresenta-

tion, and therefore was barred by § 2680(h) of title 28, and that the plaintiff's claim was barred by the discretionary function exemption. In discussing the latter holding, the court stated:

> "It cannot be gainsaid that the FAA had to make some relatively high-level choices. It had to decide whether the waived requirements in AIL's bid were, on the one hand, minor irregularities or mere differences in responsibility of the bidders, or, on the other, were essential requirements of responsiveness of the bid. It had to decide, in addition, whether to set aside all bids and to readvertise. Perhaps the agency's actual choice amounted to an abuse of discretion which could be set aside in an injunctive or declaratory action, but we think there is no doubt that there was in fact some significant degree of choice and the contracting officer's obligation was not purely ministerial." 172 U.S.App.D.C. at 288, 521 F.2d at 948.

Finally, in *Myers & Myers, Inc. v. United States Postal Serv.,* 527 F.2d 1252 (2d Cir. 1975), the plaintiff contended that the Postal Service had acted negligently in refusing to renew six "star route contracts"[18] that the plaintiff had held for twenty-six years. The district court dismissed the complaint for want of subject-matter jurisdiction, and the court of appeals reversed in part on other grounds. Its discussion of the discretionary function exception is especially relevant here:

> "I. *Operational Level Acts.*
>
> While appellants argue that the awarding of contracts here was on an 'operational level,' as opposed to a discretionary one, *Hendry v. United States,* 418 F.2d 774, 782–83 (2d Cir. 1969), the award of Government contracts is generally held to

16. *See, e. g., Rayonier, Inc. v. United States,* 352 U.S. 315, 319–20, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957); *Indian Towing Co. v. United States,* 350 U.S. 61, 68–69, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Pigott v. United States,* 451 F.2d 574 (5th Cir. 1971) (per curiam).

17. *See, e. g., Birnbaum v. United States,* 436 F.Supp. 967, 973 (E.D.N.Y.1977); *Avery v.*

*United States,* 434 F.Supp. 937, 943–44 (D.Conn.1977).

18. The contracts were so named because stars were used in the contract to designate certain boilerplate terms. *See Myers & Myers, Inc. v. United States Postal Serv.,* 527 F.2d 1252, 1253 n. 1 (2d Cir. 1975).

involve the exercise of a discretionary function. [Citations omitted.] 'Where there is room for policy judgment and decision there is discretion,' the leading case tells us. *Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). *See also* H.R.Rep. No. 1287, 79th Cong. 1st Sess. 5–6 (1945). Determining whether or not to renew star route contracts involves a number of policy factors, including the contractor's past performance, the nature of the routes, the needs of postal users, and, under 39 U.S.C. § 5005(c), due consideration of what 'best serves the public interest,' and the cost of the transportation service. That a mistaken assumption of the facts was relied upon in the Postal Service choice of contractor here does not make the choice any the less discretionary. While the legislative history of 39 U.S.C. § 5005(a)(4), (b)(2), indicates that the statute was enacted to give star route contractors a measure of security, . . the language is precatory only; it does not call for automatic renewal in disregard of all other considerations.

## II. *Negligent Investigation.*

A more persuasive claim for the appellants is that the Postal Service's decision was based on 'negligent investigation' of the facts surrounding the contract renewal decision, and that this negligence does not concern the discretionary contract award decision and therefore states a proper ground for relief under the Tort Claims Act. Appellants apparently analogize this investigation to the medical examinations in *Hendry v. United States, supra,* where negligence in an examination administered as a prelude to licensing and certification of the plaintiff as fit for sea duty was held to state a ground for relief. The Postal Service argues that even if there were negligence in the Postal Service investigation resulting in the decision not to renew the appellants' contracts, the gist of the action is tortious interference with contractual rights, and that such claims are barred specifically under 28 U.S.C. § 2680(h). [Citations omitted.]

There is a superficial plausibility to the Government's position. But we need not determine which of the parties' views is the more reasonable because we believe a third characterization most accurately describes this aspect of appellants' claim. We view the complaint as stating that the Postal Service has abused its discretion and has acted arbitrarily and with insufficient and erroneous evidence in its contract renewal actions. Thus viewed, the action complained of still falls within the § 2680(a) exception from jurisdiction where negligence in the performance of a discretionary function is alleged." 527 F.2d at 1256–57.

The plaintiff's claim based on negligent selection of an independent contractor falls squarely within the rationale of *Scanwell* and *Myers & Myers.* The United States employees who decided to award the contract for fuze rockets to Action undoubtedly considered a number of "policy factors" in arriving at their decision. Items such as the type and quantity of fuzes needed, the amount of each contractor's bid, the responsiveness of each bid, the fitness of each bidder, the location of each bidder, the quality of the work that could be expected from each bidder, the past performance of those bidders who had previously held other government contracts, and the ability of each bidder to comply with detailed safety specifications are among the considerations that were probably weighed in reaching a decision. The selection of a contractor simply cannot be labelled a purely ministerial task. *Scanwell Laboratories, Inc. v. Thomas,* 172 U.S.App.D.C. at 288, 521 F.2d at 948. Therefore, whether or not the United States was negligent in selecting Action, that selection is not reviewable under the Federal Tort Claims Act.

The plaintiff's theory based on negligence in allowing work to continue at Action also falls within the rationale of *Myers & Myers.* The decision to permit a contract to continue is closely akin to the decision to renew (or not to renew) a contract; many of the same policy considerations weigh in each decision. In view of the

discretionary function exemption, a court may not reexamine either decision based on a claim that the safety factor was assessed improperly, or that some other factor should have been subordinated to the safety factor. Nor would a different result be proper on a claim that the decision-maker negligently failed to recognize a safety hazard and thus negligently permitted work to continue without ever engaging in such a policy calculus. The discretionary function exemption applies to a *failure to perform* a discretionary function as well as to the performance of such a function. 28 U.S.C. § 2680(a) (1970). Accordingly, the plaintiff cannot recover on either theory of negligence under section 411 of the Restatement (Second).

*Section 414 of Restatement (Second)*

■ The plaintiff's final contention is that the United States is liable under section 414 of the Restatement (Second), which provides:

"§ 414. Negligence in Exercising Control Retained by Employer

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

Although section 414 has been adopted by the Pennsylvania courts,[19] the plaintiff cannot recover under section 414 on the facts of this case. The United States simply retained no control over the work done at Action. None of its employees, including the QARs who were "in residence" at Action, had the authority to direct Action employees to alter their procedures in any way. True, Action supervisors were sometimes quick to adopt safety recommendations made by DCASR inspectors, but this falls far short of the degree of control

needed to establish a basis for liability under section 414. *See also United States v. Orleans,* 425 U.S. 807, 813–16, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *Gibson v. United States, supra,* 567 F.2d at 1242–43.

The plaintiff argues that under *Jamison v. A. M. Byers Co.,* 330 F.2d 657 (3d Cir.), *cert. denied,* 379 U.S. 839, 85 S.Ct. 74, 13 L.Ed.2d 45 (1964), an employer who retains the right to order the independent contractor to cease performing the work specified in the contract retains control under section 414. Therefore, the argument runs, because the United States reserved the right to order Action to halt its work, the United States may properly be held liable under that section. The Third Circuit did predicate its finding of control in *Jamison* largely on several contractual provisions that allowed the employer to either halt the contractor's work or direct and control the manner in which certain portions of the work would be performed. 330 F.2d at 660–61. *Jamison,* however, was decided under section 410 of the first Restatement of Torts. Although section 410 of the Restatement (Second) is virtually identical to its predecessor, the American Law Institute, in adopting the present version, appended to it the following new comment:

"c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is

19. *Moss v. Swann Oil, Inc.,* 423 F.Supp. 1280, 1282 (E.D.Pa.1977); *see Byrd v. Merwin,* 456 Pa. 516, 317 A.2d 280 (1974).

not entirely free to do the work in his own way."

This comment, based on a number of decisions under the first Restatement,[20] squarely rejects the theory, advanced by the plaintiff, that the mere right to order the work stopped amounts to "control" upon which a finding of negligence may be based. Thus, the United States did not retain control of any part of the work within the meaning of section 414, and the plaintiff therefore may not recover under that section. *See also United States v. Orleans, supra,* 425 U.S. at 813–16, 96 S.Ct. 1971, 48 L.Ed.2d 390; *Gibson v. United States, supra,* 567 F.2d at 1242–43.

## CONCLUSIONS OF LAW

1. Jurisdiction over this action exists under 28 U.S.C. § 1346(b) (1970).

2. Pennsylvania law governs the substantive issues of liability in this action. 28 U.S.C. § 1346(b) (1970).

3. The United States selected and retained Action as an independent contractor for the manufacture of fuze rockets.

4. The United States retained no control over the manner in which Action performed its work under the contract.

5. The United States, by failing to enforce safe working conditions at Action, violated neither the Walsh-Healey Act nor the regulations issued pursuant thereto.

6. The United States, by failing to enforce safe working conditions at Action, violated neither the Act of May 18, 1937, Act No. 174, 1937 Pa.Laws 654, nor the regulations issued pursuant thereto.

7. The United States is not liable under a negligence per se analysis.

8. The contract awarded to Action was not a chattel "dangerous for the use for which it is supplied" within the meaning of

section 388 of the Restatement (Second) of Torts.

9. The United States is not liable under section 388 of the Restatement (Second) of Torts.

10. The plaintiff has not shown that Mrs. Toole's death was caused by the absence from the contract of a more detailed description of a safe barricade for performing the staking operation.

11. Section 413(a) of the Restatement (Second) of Torts does not impose liability where the employer of an independent contractor negligently fails to enforce safety requirements contained in the contract.

12. The United States is not liable under § 413(a) of the Restatement (Second) of Torts.

13. Section 416 of the Restatement (Second) of Torts imposes vicarious liability on the employer of an independent contractor for the negligence of the contractor.

14. The waiver of sovereign immunity embodied in the Federal Tort Claims Act does not extend to claims based on vicarious liability for the negligence of one not employed by the United States.

15. The United States is not liable under section 416 of the Restatement (Second) of Torts.

16. Section 410 of the Restatement (Second) of Torts imposes liability on the employer of an independent contractor only where the contractor acted or failed to act pursuant to the employer's negligent orders or directions.

17. Action's failure to test Mrs. Toole's barricade was not pursuant to the United States' orders or directions.

18. Action's failure to limit the quantities of explosives that Mrs. Toole kept at her barricade was not pursuant to the United States' orders or directions.

---

20. The Reporter's Notes cite the following authorities: *McDonald v. Shell Oil Co.,* 44 Cal.2d 785, 285 P.2d 902 (1955); *Kansas City, M. & O. R. v. Loosley,* 76 Kan. 103, 90 P. 990 (1907);

*Moore v. Charles T. Wills, Inc.,* 250 N.Y. 426, 165 N.E. 835 (1929); *Marion Shoe Co. v. Eppley,* 181 Ind. 219, 104 N.E. 65 (1914).

19. The United States is not liable under section 410 of the Restatement (Second) of Torts.

20. The waiver of sovereign immunity embodied in the Federal Tort Claims Act does not extend to any claim based on the performance of, or the failure to perform, a discretionary function. 28 U.S.C. § 2680(a) (1970).

21. The initial selection of a government contractor and the decision to allow work to continue under a government contract are both discretionary functions.

22. The United States is not liable under section 411 of the Restatement (Second) of Torts.

23. Section 414 of the Restatement (Second) of Torts imposes liability on the employer of an independent contractor only where the employer retains such control over the work that "the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, Comment c (1965).

24. The mere right of the employer to order the work stopped is an insufficient basis on which to predicate a determination of liability under § 414.

25. The United States retained no control over the work done by Action, apart from a general right to order the work stopped.

26. The United States is not liable under section 414 of the Restatement (Second) of Torts.

27. The United States is entitled to judgment in its favor.