Beatrice MELTON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 76–1891.

United States District Court, District of Columbia.

March 12, 1980.

Florence R. King, Washington, D. C., for plaintiff.

John H. E. Bayly, Jr., Asst. U. S. Atty., Washington, D. C., for defendant.

1. Essentially at all times pertinent to this case, the RLA was an agency of the United States. On July 1, 1974, by virtue of the home rule law, it became a part of the government of the District of Columbia. *See* District of Columbia Self-Government and Governmental Reorganization Act, §§ 201–204, 771.

OPINION

HAROLD H. GREENE, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, alleging that the government negligently selected contractors to rehabilitate real property plaintiff owns in the District of Columbia and negligently supervised the rehabilitation project after it was started. The case was tried by the Court, and this Opinion incorporates the Court's findings of fact and conclusions of law.

I

Plaintiff, a resident of Jamaica, New York, is the owner of a small house located at 1812—9th Street, N.W., in the District of Columbia, given to her by her father. In June 1972, she was warned by the D.C. Department of Building, Housing, and Zoning that an inspection of the property—which then contained three rental apartments—had revealed 98 violations of the housing code and that she was required to abate these violations. Shortly thereafter, plaintiff was contacted by the Redevelopment Land Agency (RLA)[1] which advised her that, because her property was located in the Shaw Urban Renewal Area, she was entitled to a so-called section 312 housing and urban development loan, 42 U.S.C. § 1452b, designed to enable her to comply with the government's requirements in regard to the housing violations, and to permit her to remodel the property so as to provide four apartments instead of three. Through the efforts and with the assistance of the RLA, plaintiff was awarded a $40,-600 loan to be used for the rehabilitation and renovation work.[2]

In February 1973, RLA personnel completed, and plaintiff approved, a detailed work-up, describing the plans and specifica-

2. The renovation project was announced with considerable fanfare, both because it was the largest project up to then undertaken by RLA and because the property had once been the home of Mary McLeod Bethune, the famed director of the National Youth Administration. RLA intended to mount a publicity campaign at the completion of the project.

tions for the project. Two months later, the Agency, on the basis of sealed bids[3] submitted by contractors on an Agency-maintained list,[4] selected Apex Modernizing Co. (Apex) to perform the work called for by the plans.

Plaintiff herself had no voice in selecting the contractor,[5] except that she did sign a form on which Apex had tentatively been preselected by RLA. In fact, Ms. Melton did not meet representatives of Apex until August 1973, when together they attended a settlement conference with RLA. At that conference, plaintiff signed another RLA form representing the agreement with Apex for the performance of the rehabilitation work, a promissory note for the amount of the loan, and a deed of trust securing that note. Under the agreement, Apex was to be paid in installments in accordance with a specific formula as the work progressed.

Thereafter, plaintiff at various times[6] received forms forwarded or submitted to her, signed both by James Greenleaf, rehabilitation specialist in charge of plaintiff's project for RLA,[7] and his supervisors,[8] evidencing progress in accordance with the terms of the agreement. Upon receipt of

these forms, and in accordance with RLA advice, plaintiff signed the forms—which authorized the disbursement of funds—and the corresponding checks on her loan account.[9]

In the meantime, various problems arose. In December 1973, plaintiff was notified by the D.C. Department of Building, Housing, and Zoning that work on the project would have to be halted for lack of a building permit, and in February 1974, she was advised that a zoning variance was necessary if the project was to proceed further. However, RLA's employees continued to assure her that these were essentially technicalities peculiar to the way of doing business in the District of Columbia, that there was no cause for concern, and that these matters were being taken care of.[10] Plaintiff had no reason to doubt these assurances, for the agreement explicitly provided that the responsibility for obtaining all permits and licenses rested with the contractor.[11]

Plaintiff was also advised that the RLA was monitoring and supervising the work on a continuing basis,[12] and accordingly she did not, except on two or three occasions,

3. Actually, Apex appears to have been the only bidder on this particular project.

4. Bidding was restricted to contractors appearing on the RLA list.

5. A document signed by plaintiff specified that she "authorize[d] the RLA to obtain bids from qualified contractors in accordance with the applicable bid procedures of RLA."

6. These progress reports were generated in September 1973 and in January, October, and December 1974.

7. The December 1974 progress report was attested to by Gerard E. Rogers, Greenleaf's successor.

8. Originally, the supervisor was one Ray E. Stull; this function was subsequently assumed by Lewis J. Sanford and James Littlejohn. Ronald A. Russo was also significantly involved in the supervision of Greenleaf and the project.

9. The loan, excluding a contingency fund and taxes, was for the amount of the contractor's bid—$38,885. All of the funds were retained

by RLA in an escrow account against which plaintiff wrote checks in a total amount of $34,981 as the work was allegedly progressing. She is still paying interest not only on that amount but also on the $3,904 which RLA has held at all times and never disbursed to anyone.

10. In fact, a zoning variance was granted by the Board of Zoning and Adjustment in May 1974. The record is not clear on whether and when a building permit was acquired.

11. Copies of such permits and licenses had to be furnished to RLA.

12. Their assumption of responsibility in that regard is consistent with the terms of the May 1973 agreement which provided that "the Owner shall not be liable to the Contractor in the event the Agency and/or the District of Columbia Government and/or HUD disapproved the Rehabilitation Work, or a portion thereof . . . and the Contractor shall make such repairs and/or alterations as are necessary to secure the approval of the Agency and/or the District of Columbia Government and/or HUD, at his own cost and expense."

travel to Washington to review the progress of construction. She did, however, fill in the appropriate blank on RLA's progress report forms whenever called upon to do so, evidencing that the work done was of an acceptable quality.[13]

In July 1974, by a letter signed by Claude N. Juggins, its president, Apex withdrew from the project, and RLA awarded the contract to J. Coleman Masonry & Concrete Work. Coleman likewise failed to perform, and in March 1975, plaintiff was informed that the funds were exhausted,[14] and that, although the project had not been completed, all work had ceased.

In the meantime, Greenleaf had been replaced as the rehabilitation specialist in charge of the Melton project by Gerard E. Rogers. Rogers estimated that it would cost $17,000 to finish the job, but by then the balance remaining in plaintiff's account was far below that amount. RLA sought a grant [15] from the U.S. Department of Housing and Urban Development to complete the job but this was not approved. HUD also turned down a plan to use the remaining funds in plaintiff's escrow account to board up the property to protect it from vandalism.

No additional progress has been made on the project since the funds ran out in January 1975. Instead, through vandalism and neglect, the property has been essentially gutted. In February 1977, the D.C. Department of Finance and Revenue issued a special assessment to plaintiff, charging her $1,145 for the cost of barricading the premises and for removing trash and debris. In March 1975, Greenleaf, the rehabilitation specialist assigned by RLA to plaintiff's project, pleaded guilty to receipt of a $2,000 bribe from Apex' president Juggins in connection with that project (and possibly others), and he was sentenced by Judge George L. Hart, Jr. to imprisonment for a term of six to eighteen months.[16]

Plaintiff's account of the history of the rehabilitation project and her understanding of her responsibilities and those of RLA's agents was corroborated both by the documentary evidence and by a former RLA official. James Littlejohn, the rehabilitation officer in charge of the Shaw Urban Renewal Area between 1974 and 1979, testified that his office was giving technical advice and assistance to owners in the Shaw area, providing them with data, helping them to process applications, and the like. His officers and specialists also prepared surveys and work write-ups, and selected the contractors to perform the work. If the cost of any particular project exceeded $10,000, the contract was awarded by competitive bidding, but the bidding was limited to contractors on RLA's list of eligible companies. That list was prepared and maintained by RLA officials at an administrative or supervisory level. Neither Apex nor Coleman should have been on the list at all, for they lacked both the requisite experience and the necessary home improvement licenses. Littlejohn further explained that jobs were awarded by RLA to the lowest bidder from those on the list, the homeowner himself having no effective influence on the selection process. After a contract was signed, an RLA rehabilitation specialist had the duty to monitor the job. Payments were made in installments as the job progressed, the progress to be measured by the rehabilitation specialist and his supervisors.

In Littlejohn's view, the rehabilitation project on plaintiff's property was a failure

---

**13.** When plaintiff received the forms for her signature, they already bore the signatures of the rehabilitation specialist and his supervisor attesting to the satisfactory completion of the work.

**14.** The funds ran out in January, but plaintiff learned of that fact only in March when she happened to visit the property and subsequently confronted Ronald Russo of the RLA. At various times, she attempted to enlist the aid of Russo and other RLA officials, including Mel-

vin Mister, its Administrator, all without success.

**15.** A grant was necessary because the maximum loan amount under federal law had been reached.

**16.** 18 U.S.C. § 201(g). Juggins also pleaded guilty and was sentenced to a term of probation.

because (1) it was not properly planned, in that zoning requirements, the need for structural changes, and the like were not adequately taken into account, (2) neither Apex nor Coleman had previous experience with this kind of project, (3) Coleman lacked the requisite financial ability, and Apex, through its president Juggins, was dishonest, and (4) the job was not properly monitored. The witness stated that, in his opinion, there was nothing plaintiff could have done to avert the failure of the project, and that she acted as any other prudent homeowner would have acted.

In August 1974, plaintiff filed an administrative claim against the United States in the amount of $90,370.37. That claim was denied, and on October 12, 1976, she filed the instant action in this Court.[17]

The government raises three defenses: (1) contributory negligence, (2) plaintiff's action is based on a claim of misrepresentation and involves a discretionary government function and is for those reasons not covered by the Federal Tort Claims Act, and (3) the acts of James Greenleaf were beyond the scope of his employment and are therefore not binding on the government.

## II

Defendant's claim of contributory negligence may be quickly dismissed. The evidence shows that the government's agents assumed complete control both for the award of the contracts and for monitoring the work after the contracts had been signed. While on paper plaintiff may have had the option to reject the government-selected contractors, as a practical matter she was so tied by government regulations and procedures to RLA's choices that her rejection of those choices would have meant no rehabilitation contract at all. Similarly, it was RLA—through its rehabilitation spe-

cialist and that individual's supervisor—which monitored and supervised the work and which had to be satisfied with its progress, not plaintiff. RLA's officials retained all real authority with respect to the contractors' performance, they were on the scene, and they vouched for the progress of the work in writing before any new expenditures could be made.

It would be exalting form over substance to hold that plaintiff was contributorily negligent because she did not conduct her own investigation to make certain that RLA's conclusions were actually supported by the facts. As the plaintiff, whom the Court finds to be a most credible witness, quite properly stated, "I was dealing with my government and they were to protect me." On this issue of fact, the Court finds that the evidence does not establish contributory negligence.

## III

The Federal Tort Claims Act was enacted in 1948 as a waiver of the sovereign immunity of the United States from suit[18] with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. §§ 1346(b), 2674. The Act does not apply, however, to intentional torts, including *inter alia*, claims arising out of "misrepresentations" (28 U.S.C. § 2680(h)), nor does it apply to performance or failure to perform a "discretionary function." 28 U.S.C. § 2680(a).

The government vigorously argues that this case is a misrepresentation case as distinguished from one involving negligence, and for that reason it is excluded from the scope of the Federal Tort Claims Act. In support of this contention, reliance is had upon a number of decisions[19] exem-

17. An amended complaint was filed in 1978. The proceedings were stayed for some period of time for settlement negotiations, but these negotiations broke down when the Department of Justice refused to grant its approval to a proposed settlement.

18. *See, e. g., Peterson v. United States*, 428 F.2d 368 (8th Cir. 1970).

19. *E. g., Moon v. Takisaki*, 501 F.2d 389 (9th Cir. 1974); *Cargill, Inc. v. United States*, 426 F.Supp. 127 (D.Minn.1976); *National Manufacturing Co. v. United States*, 210 F.2d 263 (8th

plified and led by *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). But an analysis of these cases reveals that they have only a superficial similarity to the instant situation.

The Supreme Court held in *Neustadt* that section 2680(h) takes out of the Federal Tort Claims Act any claim based on false representation, irrespective of whether that representation is intentional or negligent. Accordingly, it is quite true that, as the government contends, it makes no difference whether any misrepresentations RLA's agents may have made to plaintiff were negligent or intentional, for she is not entitled to recover under either hypothesis. But that analysis misconceives the real issue. The crucial difference between this case and the *Neustadt* line of decisions is that the gravamen in all of them was misrepresentation of some sort;[20] here the government's wrong is something else entirely.

Plaintiff is not suing on account of the false representations made to her by the RLA officials. She is suing because of the failure of those officials to exercise due care in the selection of the rehabilitation contractors and the supervision of their work. To be sure, misrepresentations were made to her regarding the competence of the contractors and the progress of the work on the project, but these representations were incidental[21] to the real fault ascribed to the government—the acts of selecting incompetent contractors and supervising them in a careless manner. These are acts of negligence pure and simple, and

they are not beyond the jurisdictional reach of the Federal Tort Claims Act. *See Ingham v. Eastern Air Lines*, 373 F.2d 227, 239 (2d Cir. 1967); *Beech v. United States*, 345 F.2d 872 (5th Cir. 1965); *United Air Lines, Inc. v. Wiener*, 9 Cir., 335 F.2d 379; *Hicks v. United States*, 167 U.S.App.D.C. 169, 511 F.2d 407 (D.C.Cir.1975); *In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723 *supplemented* 449 F.Supp. 574 (S.D.N.Y.1978); *In re Air Crash Near Silver Plume, Colorado*, 445 F.Supp. 384 (D.Kan. 1977).

Similarly, plaintiff's claim does not fall within the "discretionary function" exception codified in section 2680(a) of Title 28. The exercise of such a function—which is protected from suits under the statute—must be distinguished from mere operational decisions—which are not. A series of decisions holds that the award of contracts constitutes the exercise of a discretionary function within the meaning of the statute. *See, e. g., Scanwell Laboratories, Inc. v. Thomas*, 172 U.S.App.D.C. 281, 521 F.2d 941 (D.C.Cir.1975); *Toole v. United States*, 443 F.Supp. 1204 (E.D.Pa.1977); *Gowdy v. United States*, 412 F.2d 525 (6th Cir. 1969). But in these cases the exercise of a discretionary function was found to exist essentially because "relatively high level choices"[22] were being made or because the government officials involved "undoubtedly considered a number of 'policy factors' in arriving at their decision."[23]

While the government traditionally clings to the discretionary function exception in a great variety of situations, it is now gener-

---

Cir. 1954); *Marival, Inc. v. Planes, Inc.*, 306 F.Supp. 855, 859 (N.D.Ga.1969).

**20.** In *Neustadt* itself, for example, the claim was that a purchaser of real property had been furnished a statement reporting the results of an inaccurate FHA inspection and appraisal and that he had been induced to pay a purchase price in excess of the true market value of the property.

**21.** The misrepresentations made by the government's agents are relevant, if at all, only to the issue of contributory negligence (Part II *supra*). Thus, it could be argued that, but for such misrepresentations, plaintiff would have been on notice that work on her property was

not proceeding in regular order and that, had she then failed to take action on her own to save the project, she would have been guilty of contributory negligence. There is no indication that section 2680(h) was intended to be applied to that kind of reverse negligence problem, and there is no basis either in the language of the statute or the policy which underlies it to apply it in that way here.

**22.** *Scanwell Laboratories, Inc. v. Thomas, supra*, 172 U.S.App.D.C. at 288, 521 F.2d at 948.

**23.** *Toole v. United States, supra*, 443 F.Supp. at 1222.

ally recognized by the courts that this exception is limited to true policy formulation and does not protect purely routine operational matters.[24]  *See Downs v. United States*, 552 F.2d 990 (6th Cir. 1975); *Driscoll v. United States*, 525 F.2d 136 (9th Cir. 1975); *Seaboard Coast Line R. Co. v. United States*, 473 F.2d 714 (5th Cir. 1973); *United States v. Hunsucker*, 314 F.2d 98 (9th Cir. 1902); *Cruikshank v. United States*, 431 F.Supp. 1355 (D.Hawaii 1977).[25]

■ As the record shows, the instant case did not involve the kind of high policy judgments that are and properly should be immune from second-guessing by way of a tort action in the courts.  Contractors were apparently placed on the list of eligibles in a routine manner, depending upon whether they had home improvement licenses and the requisite financial and management capabilities,[26] and when a specific contract was to be awarded, it automatically went to the lowest bidder on the list.[27]  There is thus on the facts no basis for applying the discretionary function exception to plaintiff's claim that the government was negligent in selecting the contractors who were to perform the rehabilitation work.

■ As for the second aspect of plaintiff's action—the negligent supervision of the contractors—the exception has no application at all.  Certainly, such supervision cannot by any stretch of the imagination be regarded as constituting an exercise of judgment at a planning level.  *Seaboard Coast Line R. Co. v. United States, supra; S. Schonfeld Company, Inc. v. SS Akra Tenaron*, 363 F.Supp. 1220 (D.S.C.1973); *Swanson v. United States*, 229 F.Supp. 217

(D.Cal.1964); see also, *Dalehite v. United States*, supra, 346 U.S. at 42, 73 S.Ct. at 971; *Indian Towing Company v. United States, supra*.  One or more relatively low-level employees simply failed to carry out with due care what their job descriptions required them to do.  See *American Exchange Bank of Madison v. United States*, 257 F.2d 938 (7th Cir. 1958); *McNamara v. United States*, 199 F.Supp. 879 (D.D.C. 1961).

## IV

The Federal Tort Claims Act renders the United States liable for negligent acts or omissions of an employee done "within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  Since James Greenleaf, the rehabilitation specialist assigned to plaintiff's project, was convicted of bribery in that connection, the question arises whether he could be considered as having acted within the scope of his employment under traditional agency principles, and if not, whether he bound his employer, the United States, to pay for his wrongdoing.

■ It is clear that an act may be within the scope of employment even though it is criminal or tortious.  See Restatement (Second) of Agency, § 231, p. 512 (1958); *M. J. Uline Company v. Cashdan*, 84 U.S.App. D.C. 58, 171 F.2d 132 (D.C. Cir. 1948) (hockey player may be advancing the interests of his employer even though he committed an

---

**24.** The distinction is generally thought to be justified on the theory that essentially legislative or otherwise complex governmental decisions should not be subjected to judicial scrutiny in a tort context but more properly by an appeal from the administrative determination. *Remedies Against the United States*, 70 Harv.L. Rev. 827, 892–93 (1957); Jaffe, *Suits Against Governments and Officers: Damage Actions*, 77 Harv.L.Rev. 209, 237 (1963).  That rationale, of course, does not apply to the exercise of more mundane functions.

**25.** The teaching of the seminal *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed.

1427 (1953) with respect to this subject was subsequently explained and narrowed along these lines in such cases as *Indian Towing Company v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

**26.** As noted *supra*, the system failed in the instant case in all respects.

**27.** Provided the bid was within fifteen per cent of RLA's estimate.

assault during the game); *Neary v. Hertz Corp.*, 231 F.Supp. 480 (D.D.C.1946) (assault by employee-motorist on another motorist involved in auto accident which occurred while pursuing business of the employer was within scope of employment); *Dilli v. Johnson,* 71 U.S.App.D.C. 139, 107 F.2d 669 (D.C. Cir. 1939). On the other hand, if the employee committing the crime is acting solely for his own benefit, his employer is not liable. *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C.App.1979); *Park Transfer Co. v. Lumbermens Mutual Cas. Co.*, 79 U.S.App.D.C. 48, 142 F.2d 100 (D.C. Cir. 1944).

■ Upon consideration of the record herein, the Court concludes that Greenleaf's criminal activity was not within the scope of his employment. Under no persuasive theory can his involvement in a bribery scheme be regarded as furthering his employer's interests, and the government accordingly does not bear any direct responsibility for his actions regarding plaintiff and her project.

■ That does not end the matter, however, for the government is liable to plaintiff on two other, somewhat interrelated, bases. In the first place, it is responsible in tort for failing to exercise due care in supervising Greenleaf. See *International Distributing Corporation v. American District Telegraph Company,* 186 U.S.App.D.C. 305, 569 F.2d 136 (D.C. Cir. 1977). Ronald A. Russo, direct supervisor of Greenleaf, should have been, and, in fact, was aware of the mismanagement of the Melton project by Greenleaf, yet he failed to take remedial action. Littlejohn, also a supervisor of Greenleaf, who approved and signed certifications as to the amount and quality of work completed, should have, but did not, confront inconsistencies between Greenleaf's report and information from other sources that the work was unfinished.

Secondly, Greenleaf was not the only government agent responsible for the debacle that occurred with respect to plaintiff's rehabilitation project. Employees other than Greenleaf prepared the list of contractors from which Apex and Coleman were selected, and the evidence demonstrates that they failed to exercise due care in performing that responsibility. In a significant sense, the preparation of that list was a principal proximate cause of the injury to plaintiff's interests, because, but for that negligence, the incompetent and fraudulent contractors would not have been hired, and it is unlikely that any of the remaining difficulties—including the bribery—would have arisen. Beyond that, Greenleaf's various supervisors, as well as his successor in the job of rehabilitation specialist, were equally responsible with him for the negligent performance of the work on the project itself. None of these persons committed any criminal offense, and all of them were fully acting within the scope of their respective employments.

### V

The events surrounding the rehabilitation of Ms. Melton's property, instead of achieving their original aim [28] of bringing credit to social programs of benefit to the inner city,[29] ended up lending comfort to those hostile to such efforts.

The depressing saga of confusion and inefficiency began when the government, through one of its agencies, determined that housing code violations existed on plaintiff's property and demanded that she take remedial action. Another agency promptly offered and granted her a loan under a widely-publicized rehabilitation program, but to implement its action it selected contractors who were incompetent, corrupt, or both. For over a year thereafter, a number of public employees induced plaintiff to authorize payments at regular

---

**28.** *See* note 2 *supra.*

**29.** Plaintiff, a black woman who describes herself as a "poor working girl" was given the inner city property here involved. Upon its rehabilitation she intends to use it to supplement her relatively modest income. The renewal of the Shaw area itself constitutes an important part of the efforts of both the federal and District of Columbia governments to revitalize the core of the nation's capital.

intervals, falsely assuring her that the work on the project was being carefully monitored and was proceeding on schedule. Eventually, the project ran out of funds,[30] but even then the situation could still have been saved by a relatively small $17,000 grant, but another agency of government adamantly refused to approve this expenditure.

Not unexpectedly, after construction on the by now unoccupied premises ceased, vandals began their work, and it was decided that the property had to be boarded up. Instead of paying for the barricading job, or at least allowing plaintiff's still solvent loan account to be charged for the necessary amount,[31] the government, to add insult to injury, assessed her $1,145 for securing the premises at a time when they had already been gutted.[32] Finally, yet another arm of government proclaims that all of this is truly unfortunate [33] but that for a variety of reasons, it is not the government but Ms. Melton who must bear the loss.[34] The Court disagrees, and finds for the plaintiff. Judgment will be entered in the amount of $121,411.[35]

**30.** However, plaintiff was not informed of that fact for several months.

**31.** There still were, and are, almost $4,000 left in the account, and plaintiff is still paying interest on those idle funds.

**32.** It is of little comfort to plaintiff that a number of different departments and agencies, each considering only its own relatively parochial interests, contributed toward achievement of the ultimate result.

**33.** Defendant's Post-trial Memorandum states (p. 3) that "[w]hat [plaintiff] really alleges is that she was duped. Indisputably, of course, and inexcusably, she was. Yet, however lamentable plaintiff's plight, relief is not to be achieved through an action brought in the District Court under the Act."

**34.** This is not a reflection on the attorneys who defended the government in court. Undoubtedly believing that it had technical defenses available, the Department of Justice had previously made a deliberate decision not to settle this case but to contest it to the very end.

**35.** Plaintiff claims as damages (1) the cost of completion of the project (2) lost profits from the rental of the property for a period of 72 months (3) reimbursement for the special assessment of $1,145 and (4) interest on the $40,-600 note at the rate of 3%.

For tortious damage to realty two standard measures of damages are commonly used: diminution in value of the damaged property and cost of restoring or repairing the damage resulting from the tortious conduct. The test to be applied depends on numerous factors, particularly which test is more likely to result in full and reasonable compensation to the plaintiff. Dobbs, *Remedies*, § 5.1 (1973). This Court concludes that an award of the amount of funds necessary to complete the restoration of plaintiff's property will more adequately compensate the plaintiff for the injury to her realty than will diminution in value. Some courts have refused to award repair cost when it will provide the owner with a more valuable building than he had prior to the tort. *See e. g., Stanley Co. v. Hercules Powder Co.*, 16 N.J. 295, 108 A.2d 616 (1954). These decisions are inapposite to the present case in which the defendant's tortious conduct involved a failure to fulfill a contract to improve plaintiff's property.

According to the plaintiff, it would cost from $92,000 to $95,000 to complete the project, although Mr. Samuel Bran, who was not a very impressive witness, testified that it would take $118,000. When the amount of damages is uncertain, the trier of fact may make reasonable inferences from the facts in evidence in computing damages. *Tatum v. Morton*, 386 F.Supp. 1308 (D.D.C.1974). Based on all the testimony, the Court concludes that the $95,-000 estimate best approximates the cost of completion of the project.

The plaintiff may recover as special damages the lost profit on the rental property resulting from the defendant's negligence, provided these damages are proven to a reasonable certainty and were proximately caused by defendant's tort. Here, the lost profits from the plaintiff's property are a proximate cause of defendant's negligence. Prior to the attempted rehabilitation of plaintiff's property, the three existing apartments in the building had been rented at a total rate of over $200 per month. Had it not been for the negligent supervision of the renovation of the property, the plaintiff would have been able to rent the apartments beginning in February 1974. Plaintiff estimated that the four new apartments could be rented at a total of $550 per month. The mortgage payments on the property, trash removal service, salary of a resident manager, and miscellaneous items would amount to approximately $300 per month in expenses. A monthly net profit of $250 for the 72-month period between the time of the estimated completion of the project and this date would amount to $18,000. The Court views this net profit as reasonably certain and as the result of the defendant's negligent conduct.

Likewise, the reimbursement cost for the special assessment against the plaintiff for the boarding of her property is recoverable. The defendant's conduct was a proximate cause of the need to have the property boarded, resulting in an assessment against the plaintiff. Thus, the amount of $1,145 paid by the plaintiff based on the assessment is awardable as damages.

Further, plaintiff is entitled to receive the $7,266 for the 3% interest which she owes on the $40,600 note from RLA. If the defendant had supervised and timely completed the Melton project as required by contract, the plaintiff would have been able to begin paying the interest accruing on the loan from HUD. However, her inability to make any profits from the property crippled her capacity to repay the loan or the interest thereon.

The total damages amount to $121,411.