**Mitchell PARK, Susan Park and Johanna Park, by her parents and next friends, Mitchell and Susan Park, Plaintiffs,**

v.

**UNITED STATES of America, John R. Block, individually and in his capacity as Secretary of the United States Department of Agriculture; Farmers Home Administration; Gordon Cavanaugh, individually and in his capacity as Administrator of the Farmers Home Administration; Kenneth H. Keudell, individually and in his capacity as Oregon State Director of the Farmers Home Administration; James O. Diaz, individually and in his capacity as County Supervisor for Columbia County Oregon, Farmers Home Administration, Defendants.**

Civ. No. 78–533PA.

United States District Court,
D. Oregon.

June 11, 1981.

James T. Massey, Ira R. Zarov, Marilyn Lindgren, Oregon Legal Services Corp., Portland, Or., for plaintiffs.

Sidney I. Lezak, U. S. Atty., Judith D. Kobbervig, Asst. U. S. Atty., Portland, Or., for defendants.

## OPINION AND ORDER

PANNER, District Judge:

Plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* They seek damages for the alleged negligence of agents and employees of the Farmers Home Administration (FmHA), an agency within the United States Department of Agriculture, in the course of FmHA's approval and supervision of a Rural Housing Construction loan obtained by the plaintiffs from FmHA in 1976. The loan was made pursuant to § 502 of the Housing Act of 1949, 42 U.S.C. §§ 1401 *et seq.* The plaintiffs seek damages for the diminished value of the home and for personal injuries which they allege were proximately caused by defendants' negligent acts. After trial without jury, I find for the plaintiffs and order that judgment be entered in accordance with this opinion.

## FACTS

Plaintiffs Mitchell and Susan Park, husband and wife, reside in St. Helen, Oregon. Plaintiff Johanna Park is their daughter.

Farmers Home Administration is authorized, pursuant to the § 502 loan program,

to make loans for the purchase or construction of owner-occupied single-family dwellings in rural locations.

The Parks first visited the FmHA office in St. Helens in early 1976. James O. Diaz, then FmHA County Supervisor for Columbia County, explained to them the § 502 loan program and outlined the advantages of purchasing a newly-constructed home rather than existing housing. The Parks were given a copy of FmHA Oregon Bulletin No. 1667(444), "Guidelines for Financing Existing Housing," and were told that the requirements for new homes were more strict than those in the Bulletin for existing housing.

On February 4, 1976 the Parks applied to FmHA for a § 502 loan for the purchase of a new home. At the time of the application, the Parks believed that the involvement of federal officials in the construction of their home would assure compliance with all state, local, and federal building codes. During the course of the application, an employee of the County office provided the Parks with names of several builders in the area who were "approved" by FmHA for construction of FmHA-financed houses and to whom conditional commitments had been issued. One of those builders was Ronald Steinke.

The Parks were subsequently determined to be eligible to receive an FmHA loan because of their low income. On February 14, 1976 they entered into an earnest money agreement with Steinke for the purchase of a new home to be built at 325 North Ninth Street in St. Helens, Oregon. The purchase price of the home was $26,000. On January 7, 1976 Steinke had submitted an Application for a Conditional Commitment for FmHA financing for construction of a home on this site, conditioned upon compliance with the requirements specified in 7 C.F.R. §§ 1822.301 et seq. On March 5, 1976 James Diaz, acting in his capacity as FmHA County Supervisor, made certification on Form 422–8 that he had personally inspected the property for which Steinke sought a conditional commitment and found it to be suitable. On March 8, 1976 Diaz executed the Conditional Commitment.

Subsequent to the execution of the earnest money agreement between plaintiffs and Steinke, Steinke undertook substantial excavation of the building site, in a manner which left a twenty-five foot high vertical basalt cliff running east to west through the property. Before excavation there had been a rock ledge approximately four feet high.

Mr. Park visited the site once or twice a week during construction. In March and April he noted the change in the rock face, the height of the cliff, and the gouges in the rock from the equipment. Plaintiffs talked to Steinke to find out if the rock was going to be detrimental to the house or property. According to Mr. Park, Steinke assured them there would be no problem with the rock.

During the construction of the Park home, James Diaz, in his capacity as FmHA County Supervisor, inspected and approved the site and home on three occasions: On March 16, 1976 he approved the footing. On June 14, 1976 he approved the house at 50 percent completion. On June 28, 1976 he gave final approval.

On June 14, 1976 the defendants, acting through Diaz, approved the Parks' application for a § 502 loan in the amount of $25,550 for the home under construction by Steinke, and the Parks entered into a contract with FmHA to obtain a loan of that amount. On June 28, 1976 the Parks executed a Promissory Note and a Real Estate Deed of Trust. Part IV of the "Request for Obligation of Funds," FmHA Form 440–1, contains a certification made by Diaz on June 14, 1976, as the "approving official" of FmHA, that all laws, regulations, determinations and certifications required as prerequisites to approval of § 502 assistance had been complied with by the builder and the Parks. The promissory note and deed of trust incorporated all existing and future regulations of FmHA. During the period the Parks owned the home they made all house payments directly to FmHA.

On June 29, 1976 Steinke executed a "Builder's Warranty" to the Parks, as re-

quired by FmHA Form 424–19. The plaintiffs received a copy of this warranty on June 30, 1976.

The Parks moved into the house on July 2, 1976. Shortly thereafter, they observed numerous defects in the site preparation and construction of the home, including the excavation which had left the vertical, unstable and crumbling 25-foot rock wall immediately adjacent to the southeast corner of the house. Soon after moving in, the Parks discovered that large pieces of rock frequently dislodged from the rock cliff, striking the roof or the south .end of the house and landing in the yard. During the months following July 1976, falling rocks caused damage to the siding of the house, chipped the glass in the window of Johanna Park's bedroom, and made it impossible to plant or maintain a lawn in the front and side yards. During the time the Parks occupied the dwelling, rocks fell in and about the premises, constituting a severe danger to the Parks' physical safety and emotional well-being, and to the physical integrity of the house.

The Parks complained to the builder. On August 3, 1976 they complained to FmHA. They were advised by FmHA employees to sent written notice of the defects to Steinke, which they did. On October 8, 1976 Mitchell Park contacted the state FmHA office and spoke with Stan Schmidt, Chief of Rural Housing, concerning the rock problem. Schmidt suggested that Park contact Steinke, sell the house, or seek legal advice.

In August and October, agents of FmHA advised Mr. Park to use fallen rock from the basalt cliff to build a retaining wall for the prevention of further damage to the house. Park was advised and believed that it was his duty as a § 502 borrower to perform this task to protect the dwelling. On October 12, 1976 Morris Lillich, FmHA inspector, met with Steinke and Park at the home to discuss the falling rock. Lillich suggested that Park move existing rocks and build a platform as a catch basin for falling rocks.

Medical records of the University of Oregon Health Sciences Center indicate that Mr. Park visited the Center on October 12, 1976. His complaint was diagnosed as a strangulated hernia for which he underwent surgery on October 17. He was unable to build a protective wall or platform with the fallen rocks, due to recuperation from his surgery and for the reason that rocks continually became detached from the rock cliff and interfered with his efforts. Lillich and Steinke visited the home on November 2, 1976. Lillich observed that the rock pillar had been grouted but that the wall had not been built.

During the period from July 1976 through August 1978 the Parks made numerous oral and written requests to FmHA for assistance in requiring Steinke to repair the defects, without success. On several occasions plaintiffs asked Steinke about the safety of the rock cliff. He informed them that he relied upon FmHA inspections to assure compliance with building codes and regulations and that FmHA's approval of the home and site indicated to him that all such requirements had been met.

Plaintiffs eventually contacted Oregon Legal Services, Inc. On April 13, 1977 a letter was sent from that office seeking help from FmHA in getting Steinke to take corrective action pursuant to his builder's warranty. The rock cliff was never adequately corrected by the builder. In November 1977 the problem was referred to the FmHA State Office. Oregon Legal Services wrote a letter dated November 10, 1977 to Mr. Leland K. Halderson, District Director of FmHA, on behalf of the Parks asking for help in getting the defects corrected.

On November 15, 1977 Walter Nasmyth, a construction analyst for FmHA, visited the site and subsequently filed a report which indicated that the outcrop was "extremely unstable" and posed "an extreme hazard to the occupants of the home." He further stated that the covering of the fractured wall face with chain-link fencing material was not a satisfactory solution and recommended: (1) a fully engineered re-

taining wall with steel posts and screen above, (2) exercise warranty prerogative, (3) voluntary reconveyance, or (4) removal of rock formation (not feasible). FmHA failed to notify the Parks of Nasmyth's findings or to remove them immediately from the peril. Plaintiffs first became aware of Nasmyth's report and findings in June 1978, during the course of discovery in this action.

On December 8, 1977 plaintiffs submitted their petition for compensation for construction defects under the provisions of § 509(c) of the Housing Act of 1949, 42 U.S.C. § 1479, to the Secretary of Agriculture. On August 28, 1978 FmHA acquired title to the Park home by warranty deed from the Parks, pursuant to an agreement entered into in this Court on July 5, 1978. That agreement preserved all of plaintiffs' claims for damages and compensation at issue here. Subsequent to the acquisition of their home by FmHA, the Parks purchased a comparable replacement dwelling which was also financed pursuant to § 502. The purchase price of the second home was $37,500 plus $2,000 for repairs.

By letter dated December 27, 1977 and submission of a USDA Form 95, dated June 6, 1978, the Parks made claim upon defendants FmHA and the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675, for their injuries sustained as a result of defendants' actions. The claim was denied by defendants by letter dated August 17, 1978.

The Parks were compensated pursuant to 42 U.S.C. § 1479 by cancellation of their note of June 28, 1976, payment of closing and moving costs and expert fees for an engineer. The mortgage balance owing at the time the home was acquired by FmHA was $24,250.77; the Parks' equity was $1,749.23. FmHA subsequently resold the home for $34,850.

## FmHA STATUTORY SCHEME

The purpose of the Housing Act of 1949 is to provide "decent, safe, and sanitary" housing for certain low-income persons. 42 U.S.C. § 1437. In connection with loans made by FmHA under the rural housing program, it is required that all new buildings and repairs shall be substantially constructed in accordance with such building plans and specifications as may be required by the Secretary. 42 U.S.C. § 1476(a). Building and repairs shall be supervised and inspected as required by the Secretary. *Id.* The Secretary is authorized to furnish technical services such as building plans, specifications, construction supervision and inspection, and advice and information. *Id.*

■ Under these statutes, the FmHA has a mandatory duty to inspect and supervise all building and repair undertaken with financial assistance under the Act. The Secretary also has at least a discretionary duty to provide technical assistance. Legislative history indicates that the mandatory supervision and inspection is intended to accomplish the purposes of the Act and to preserve the government's security interest. H.R.Rep.No.590, 81st Cong., 1st Sess. 55 (1949); S.Rep.No.84, Part 2, 81st Cong., 1st Sess. 20 (1949). Thus, construction supervision and inspection was intended to benefit borrowers as well as protect FmHA's security interest.

FmHA regulations, instructions and documents define the nature and scope of the undertaking implicit in Dias' representations to the Parks. Inspection and supervision regulations are found at 7 C.F.R. §§ 1804.1 *et seq.* The inspections are to be done by the county supervisor as often as necessary, but at least at the three stages of construction identified by Diaz. 7 C.F.R. § 1804.4(g)(3). In connection with the conditional commitment process outlined in 7 C.F.R. §§ 1882.301 *et seq.*, prior site inspection is required to assure that the dwelling will be well located and on a good residential site. Specific site requirements are found at 7 C.F.R. § 1804.68(b)(1)–(3) and in FmHA Instruction 424.5, Sheet 6.

Under the regulations, builders are "approved" by FmHA officials prior to the issuance of a conditional commitment. In 7 C.F.R. § 1822.301 and in FmHA Instruction 444.9, requirements are set out for builder

approval for conditional commitments. The county supervisor is responsible for evaluating applications and is authorized to approve them.

A procedure is set out in 7 C.F.R. § 1918 for handling warranty complaints. The county supervisor is responsible for the administrative component of these regulations, while the construction analyst is responsible for the technical aspect. The purpose of these provisions is set forth in § 1918.111:

> The handling of construction complaints is a matter of prime importance because the FmHA has an interest not only in assisting the borrower-owner, but also in protecting its financial position in the property. The desire to retain home ownership is directly related to the homeowner's satisfaction with his house.

The regulations specify duties of the FmHA in regard to warranty complaints, which include a determination of complaint justification and the opening of a complaint file under the builder's name. In case of serious or repetitive failure to honor warranty claims the FmHA should initiate suspension or debarment proceedings.

## FINDINGS AND DISCUSSION

██ I find that the agents of the FmHA were negligent in the performance of their obligations and undertakings on behalf of the plaintiffs. I also find that their negligence caused injury to the plaintiffs for which the government is liable for damages.

The government undertook to perform a duty which was consistent with its statutory authorization to provide safe and decent housing. In the performance of that undertaking the government was negligent (1) in undertaking to perform its duty to inspect, (2) in determining that the site was safe, and (3) in failing to have a qualified person inspect the site prior to November 1977. I further find that the plaintiffs Mitchell and Susan Park justifiably relied on those negligent acts to their detriment.

Diaz, the FmHA county supervisor, approved the site on March 5, 1976 prior to issuing the Conditional Commitment to Steinke, and inspected the property three times during construction. While Diaz testified that Exhibit 45 showed the condition of the site when he issued the commitment on March 8, 1976, I find that when Diaz first viewed the property the excavation had not been done. The pre- and post-excavation photographs show a massive difference in the site. If Diaz had exercised due care he would have noticed the difference and the danger. Diaz stated that he did not think the rock cliff was dangerous when he made his final inspection in June 1976. Had it been, he would have withdrawn the loan. Diaz was negligent in not obtaining a report based on the difference in the site between March and June. Such extreme changes as a result of excavation should have indicated to Diaz that further expert evaluation was necessary. When the first engineer's report was finally obtained, in November 1977, it concluded that the cliff was very hazardous. If the FmHA had exercised reasonable care in the inspection process it would have discovered the hazard. Plaintiffs would not have moved into the home and invested money in it.

The government's undertaking, pursuant to the statutes and regulations, was to supervise and inspect. As part of the inspection process a determination of safety was to be made. It is inconceivable that the purpose of such inspection was solely for the protection of the government loan in light of the objective of the Act to provide decent, safe and sanitary housing.

Even though Diaz himself did not believe the rock cliff to be unsafe, the Parks testified that they questioned him or FmHA about it shortly after they occupied the house in July 1976. Despite the various complaints made by the Parks, it was not until November 1977 that the expert, Nasmyth, inspected the property. He found the outcropping to be unstable and an extreme hazard. I find that the government was negligent in not arranging for such an inspection much earlier, at least by August 1976. It should have been obvious to Diaz and to Lillich in October 1976 that the site

was unsafe. At the very minimum an engineer's report should have been obtained when the excavation had been done and it was apparent that the condition of the property was unusual.

I find that the Parks justifiably relied on the undertakings of the FmHA to inspect the property with due care, to determine its safety, and to provide technical advice and assistance when necessary.

As a result of the first meeting with Diaz at the FmHA office, Susan Park perceived the role of FmHA as an overseer and inspector of the house they would be purchasing. Diaz gave her the impression that the construction of the house would be observed and inspected and that this would be done according to the regulations and requirements of the agency. She was told that the inspections would be done according to FmHA standards, which were higher for new homes than for existing homes. As a result of this discussion, the Parks decided to purchase a newly-constructed home. Diaz explained to the Parks about pre-approved contractors, and they were told that they could only go to FmHA contractors who had the plans and knowledge of agency procedures and standards.

The Parks received a copy of the FmHA Rural Housing Loan Information, which stated that the house would have to have final approval before they could move into it. It further states that if there is a problem with a house the builder has 30 days to correct it, and if it is not corrected the FmHA will assist the homeowner in getting it remedied. They were given a copy of the Guidelines for Financing Existing Housing and were led to believe that the regulations for new housing would be stricter because the house would be constructed according to the current requirements rather than being updated to the requirements. These Guidelines state that the home must be free from environmental and land hazards.

Mitchell Park relied on the fact that FmHA was a "federal organization and knew what the laws were." He relied on FmHA officials for inspections of the property and the dwelling. Diaz told him that

the inspections would assure that everything would take place according to FmHA regulations. Park perceived the role of FmHA as a "supervisor" over the builder. He had the impression that FmHA's role in the warranty process would be to back up the homeowners and take further steps against the builder if the warranty was not fulfilled. I am satisfied that these statements were made and that the Parks relied on them. Mitchell Park could not read, and Diaz had very few notes. From all of the statements and written material the Parks were entitled to and did rely on the fact that periodic inspections would assure that the house would be safely constructed in accordance with FmHA standards and regulations.

On August 3, 1976, after the Parks moved into the home, they made a call to Diaz about the rock cliff. Someone from FmHA came to the property in early August and told them to build a retaining wall in front of the cliff and to use a load of fill to cover it and create a sort of "cushion platform". The Parks attempted to do so believing that, because FmHA requested it, it was a requirement to protect the house and the property. Neither of the Parks could recall who came to the house in August and instructed them to build this retaining wall. None of the FmHA officials had notes of this visit. However, I find that such a call was made and that someone from FmHA did so tell them in August. As noted, FmHA notes of meetings and visits were not always complete. Diaz was also making visits to a neighboring house during this period of time. The instructions to build the wall are consistent with the statements made by Lillich, who came out in October and told the Parks to build a platform and retainer on the side of the house. While this was a different location, the method suggested to alleviate the problem was identical. As a result of Mitchell Park's attempts to comply with FmHA instructions and build the wall, he suffered a hernia.

Even if the August visit was not made, and I am satisfied that it was, Park's injury

was caused by the government's negligence in putting him in a house which was unsafe. Any effort on his part to move the rocks, whether in response to specific FmHA instructions or not, was reasonable in light of the condition of the property. I also find that if FmHA did not inspect the property in August, after receiving the complaints from the Parks, this would have been negligent. It is not reasonable to receive a call about a dangerous condition in August and wait until October to send someone out to the site. When Lillich did come out in October, he also failed to carefully evaluate the safety of the property and stated that it could be remedied by the construction of a retaining wall. It was not until November 1977 that the engineer Nasmyth inspected the property, and he found it to constitute an extreme hazard. Even then, no one at FmHA communicated this information to the plaintiffs. No one notified them that the cliff could fall massively at any time. The Parks continued to occupy the house, relying on the FmHA determination that the house was safe and that the inspections had been properly performed.

Specifically, I find that the Parks were not contributorily negligent. They had never before owned a home and knew nothing about construction or geology. An ordinary person relying on FmHA and its approved builder would have acted no differently. It was reasonable for Park to attempt to move the rock which was falling against his home and threatening his family.

## CONCLUSIONS OF LAW

Under the Federal Tort Claims Act (FTCA), the United States is liable to the same extent as a private party for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Claims for misrepresentation or deceit are excluded from coverage under the FTCA. 28 U.S.C. § 2680(h).

█ If the government undertakes to perform an inspection and is negligent in that performance, it may be liable where the public has come to rely. *United Scottish Insurance Co. v. United States*, 614 F.2d 188 (9th Cir. 1979). One who undertakes to warn the public of danger and thereby induces reliance must perform his good samaritan task in a careful manner. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). When the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently. *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227, 236 (2d Cir.), *cert. denied*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

In this action, I find that the government had an obligation or duty to properly inspect the Park home site and, as previously noted, I find that it failed to exercise due care in the performance of that duty. The duty arises both from the statutory requirements and from the government's undertaking to inspect and approve the site. In *Rooney v. United States*, 634 F.2d 1238 (9th Cir. 1980), an FTCA action, the government reserved the rights to inspect and stop work as necessary, although it had turned the job over to an independent contractor. In these circumstances the government had a corresponding duty to ensure that the contractor took adequate safety precautions. *Id.* at 1244. In *Denton v. United States*, 638 F.2d 1218 (9th Cir. 1981), the court, in dicta, indicated that in FTCA cases where the government had no duty to perform a certain act, liability might be predicated on the fact that the government voluntarily assumed a duty and therefore had a resultant obligation to perform it with due care. *Id.* at 1220 n.4. The court cited as support *Rogers v. United States*, 397 F.2d 12 (4th Cir. 1968) and *Quinones v. United States*, 492 F.2d 1269 (3d Cir. 1974). In *Quinones*, the court held that plaintiff stated a claim under the FTCA where the government employer allegedly failed to use due care in the maintenance of personal records, resulting in damage to the plaintiff's reputation. Since the administrative regulations con-

templated the dissemination of the records, a risk of injury was foreseeable, and there arose a corresponding duty on the part of the government to use reasonable care in maintaining the accuracy of the records. 492 F.2d at 1277. Likewise, a risk of harm to these plaintiffs was foreseeable if the inspection was not performed with due care.

Here, the government relies on *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), an FTCA action brought by the home purchasers for the damages resulting when the purchasers relied on a negligently excessive FHA appraisal and paid a price in excess of the fair market value of the home. The court held that the claim arose out of misrepresentation and was not actionable under FTCA. In *Kipf v. United States*, 501 F.Supp. 110 (D.Mont.1980), the court held that *Neustadt* barred the plaintiffs' action for negligence. The plaintiffs received an FmHA loan; the county supervisor inspected the property, and later numerous defects were discovered. Plaintiffs alleged that the defendants were negligent in not warning them of the defects. The court determined that the thrust of plaintiffs' claim was a misrepresentation as to the condition of the house, albeit a negligent misrepresentation, and was barred by *Neustadt*. The court stated that the "negligent inspection alleged here seems more akin to misrepresentation," noted the "business nature of the transaction," and dismissed the FTCA claims. 501 F.Supp. at 113. While the facts in *Kipf* appear similar to those in the action before me, I am more persuaded by the analysis in *Neal v. Bergland*, 646 F.2d 1178 (6th Cir. 1981), *reversing* 489 F.Supp. 512 (E.D.Tenn. 1980). In *Neal,* the court noted the difference between the application of the FTCA to a cause of action based on misrepresentation and a cause of action based on negligent performance of an operational task:

> Plaintiff's claim, as we read it, is based not on misrepresentation, as in the issuance of a false or inaccurate appraisal report, but rather on FmHA's failure to use care in a voluntary undertaking, i. e., inspection and supervision of the con-

struction of her house. Congress, we believe, intended plaintiff to be the beneficiary of the inspection and technical assistance offered by FmHA given the purpose of the Act and plaintiff's particular circumstances.

At 1184.

Here, the damage to the Parks was caused, not by misrepresentations by agents of the FmHA, but by agents failing to perform their duty to inspect and supervise with reasonable care. In *Melton v. United States*, 488 F.Supp. 1066 (D.D.C.1980), the homeowner brought an action under the FTCA alleging that the government negligently selected the contractor and negligently supervised a rehabilitation project on her home. The court held that the government was liable to the property owner under those theories and that it was not a misrepresentation case:

> To be sure, misrepresentations were made to her regarding the competence of the contractors and the progress of the work on the project, but these misrepresentations were incidental to the real fault ascribed to the government—the acts of selecting incompetent contractors and supervising them in a careless manner.

488 F.Supp. at 1072.

The recent opinion of *Reynolds v. United States*, 643 F.2d 707 (10th Cir. 1981), holds that the misrepresentation exception of the FTCA bars a claim for damages for personal injuries incurred as a result of the FmHA's negligent inspection of the borrower's residence. The claim was asserted, however, by the borrower's invitee. The *Neal* court distinguished *Reynolds*:

> Here, unlike *Reynolds*, the damages alleged were the direct consequence of the alleged negligent inspections, i. e. defects in the house.

In *Reynolds*, it appears to have been significant that the plaintiff was not the borrower to whom the negligent misrepresentations had been made and who relied thereon. The plaintiff was a "bystander" who cannot be said to have relied on the expertise of FmHA in the inspection and supervision

process, and to whom no duty was owed to make competent inspections. The relationship between his injuries and the negligent inspection was too tenuous to support a claim under the FTCA.

 I hold that the instant claim is not barred by the misrepresentation exception to the FTCA. In doing so, I distinguish the underlying negligent acts from any subsequent statements. The FmHA officers did not use due care in inspecting the Park site, in supervising construction and site preparation, and in obtaining an expert evaluation from an engineer. These are negligent acts which constitute a failure to exercise reasonable care in the performance of a statutory duty which was owed to and inured to the plaintiffs. As a consequence of the negligence, statements may have been made about the safety and integrity of the home which might be classified as "negligent misrepresentations." It is not those remarks which injured the Parks but rather that no one from FmHA properly inspected or evaluated the property. It is for these acts, and not for anything that may have later been said or written, that I hold the United States liable under the FTCA. FmHA negligently inspected and approved an unsafe site; any representations later made to the Parks do not negate or supersede the earlier underlying acts of negligence.

In *Green v. United States*, 629 F.2d 581 (9th Cir. 1980), plaintiffs claimed that misstatements and omissions in a notice received from the Forest Service concerning a DDT spraying program prevented the plaintiffs from making an informed decision as to whether to continue to graze their cattle on affected lands. They suffered economic loss. The court stated that the application of the misrepresentation exception "depends upon the commercial setting within which the economic loss arose," and held that:

> [T]he misrepresentation exception precludes liability where the plaintiff suffers economic loss as a result of a commercial decision which was based on a misrepresentation by government consisting either of false statements or a failure to provide information which it had a duty to provide.

629 F.2d at 584–85. The court cites *Ramirez v. United States*, 567 F.2d 854, 856 (9th Cir. 1977) (en banc), and *Neustadt.* The Ninth Circuit standard insulates the United States from liability only "in those situations where a private individual relies to his economic detriment on the advice of a government official." 629 F.2d at 584. *Neustadt* arose in a commercial context, where there was no privity between the purchasers and the FHA appraiser, and no duty under the statute running from an FHA appraiser to the ultimate purchaser of the property. FmHA is a totally different statutory scheme where a relationship of privity, trust and reliance is created between the borrowers and the agency. This was not a commercial context given the Parks' inexperience with all matters in which FmHA held itself out as having expertise, that is, its offer of technical and professional assistance pursuant to its statutory powers. I hold that the Parks were not making a "commercial decision" regarding some business or profit-making venture as in *Green.* The decision to purchase and move into the home was personal and noncommercial. The losses suffered were both personal and economic, and I hold that the claim is not barred by *Green.*

## DAMAGES

 As a result of the government's negligent performance of its undertaking, the plaintiffs suffered damages. The Parks' original loan was $25,550, with a balance owing of $24,250.77 when the first home was resold to FmHA. During the period of time they lived in the house, they built up an equity of $1,749.23 which they never realized when they reconveyed the house to FmHA. I do not find that the house had a fair market rental value during this period, as the government asserts, as I find that it was dangerous to inhabit. When the Parks purchased a comparable replacement dwelling in late 1978, the purchase price was $37,500 plus $2,000 in repairs, for which the Parks are indebted to FmHA. I am award-

ing the Parks the difference between the purchase price of the two homes, or $13,500. The government will reduce the Parks' current note by that amount or pay that amount to the Parks. The Parks' damage consisted partially of having to purchase a more expensive home, which was in all other ways comparable to the first dwelling. Reducing that loan balance with a corresponding adjustment in the monthly payments will compensate them for the government's negligence in putting them in the first home. Additionally, plaintiffs are awarded an amount in cash equal to their equity in the first home, or $1,749.23.

Mitchell Park's hernia was the natural or direct result of the government's negligence. I am awarding medical expenses of $123 and loss of earnings of $333.72, plus $5,000 in general damages. I am awarding Susan Park $2,500 general damages for her claim for loss of consortium. The child, Johanna, was not sufficiently harmed to justify an award of damages on her behalf. She has made a complete recovery following the move to a new home.

Judgment shall enter accordingly.

IT IS SO ORDERED.